IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
March 3, 2005 Session

**SHARON MARCEL KEISLING**
**v.**
**DANIEL KERRY KEISLING**
**v.**
**FRANCISCO (FRANK) HUBERTO GUZMAN** AND
**WIFE, BILLIE ANN GUZMAN**

**An Appeal from the Circuit Court for Wilson County**
**No. 1644     William H. Inman, Senior Judge**

_____

**No. M2003-02483-COA-R3-CV - Filed November 29, 2005**

_____

This is a post-divorce petition to modify custody. During the marriage, the mother and father lived with the mother's parents. The parties were divorced in September 1998, and custody of the parties' three children was granted to the mother. After the divorce, the mother and the parties' children continued to live with the maternal grandparents. In March 2000, the mother filed a petition to restrict the father's visitation, alleging that the father sexually abused the parties' two daughters. A guardian ad litem was appointed for the children. After a hearing, the allegations of sexual abuse were determined to be unfounded. Approximately a year later, the mother filed a second petition to restrict the father's visitation, once again alleging sexual abuse. The father filed a counter-petition for custody based on a material change in circumstances. The father alleged that the mother and her parents were causing harm to the children by subjecting them to persistent questioning and repeated physical examinations in an attempt to prove sexual abuse. The mother's parents were joined as third-party defendants. The mother's parents then filed a cross-petition for grandparent visitation. After a bench trial, the trial court granted the father's petition for a change in custody and allowed the mother unsupervised visitation in the grandparents' home. The grandparents' petition for grandparent visitation was dismissed. At the conclusion of trial, the guardian ad litem for the children submitted a request for $15,000 in fees. The trial court denied the request, awarding the guardian ad litem only the $1,500 she had already been paid. The mother, the grandparents, and the guardian ad litem now appeal. We affirm the decision of the trial court, except that we remand to the trial court for reconsideration of the guardian ad litem's fee request in light of the applicable law.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is**
**Affirmed in Part, Vacated in Part, and Remanded**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, J., and DAVID R. FARMER, J., joined.

John E. Herbison, Nashville, Tennessee, for the appellants, Sharon Marcel Keisling, Frank Guzman, and Billie Ann Guzman.

Dan R. Alexander, Nashville, Tennessee, for the appellant, Sharon Marcel Keisling.

Gloria Jean Evins, Guardian Ad Litem, Lebanon, Tennessee, appellant, *pro se*.

Amanda G. Crowell, Lebanon, Tennessee, for the appellee, Daniel Kerry Keisling.


**OPINION**

This is the second appeal in this venomous post-divorce struggle over child custody between the father on one hand and the mother and her parents on the other hand.[1] Respondent/Appellee Daniel Kerry Keisling ("Father") and Sharon Marcel Keisling ("Mother") were married and had three children, D.R.K. (a son, born April 9, 1991), R.A.K. (a daughter, born June 3, 1993), and H.R.K. (a daughter, born September 6, 1996). During the marriage, Mother, Father and the children lived in the same household with Mother's parents, Respondents/Appellants Francisco (Frank) Huberto Guzman and Billie Ann Guzman (collectively, "Grandparents"). The parties were divorced on September 16, 1998. In the divorce decree, Mother was designated as the primary custodial parent, and Father was awarded liberal residential parenting time. After the divorce, Mother continued to reside with the children in her parents' home.

In March 2000, Mother filed a petition to modify Father's visitation, seeking to restrict Father's visitation based on allegations that he had sexually abused the parties' daughters. In connection with this action, Father's visitation was initially suspended, then it was restricted pending final resolution. Mother and Grandparents reported the allegations of sexual abuse to the Department of Children's Services ("DCS"), which recommended that the children be physically examined. Based on this recommendation, H.R.K. and R.A.K. were both taken by Mother and Grandmother to the Our Kids Center at the Nashville General Hospital ("Our Kids Center" or "the clinic") for physical and psychological examinations. The reports on the examinations of H.R.K. and R.A.K. indicated that, when the girls would return from visiting Father, they would be questioned at some length by Mother and/or Grandparents about whether they had been subjected to sexual abuse. In addition, they would be examined physically for indications of sexual abuse, including examinations by Grandmother of the girls' genitals with a magnifying glass. The reports concluded that there was no evidence of sexual abuse. They also strongly recommended that Mother and Grandparents refrain from the questioning the girls regarding sexual abuse and refrain from

---

[1]*See Keisling v. Keisling*, 92 S.W.3d 374 (Tenn. 2002).

physically examining them for signs of sexual abuse, noting that such repeated interrogations and examinations were harmful to the children.

On March 27, 2001, a hearing was conducted on Mother's petition to modify Father's visitation. On April 17, 2001, the trial court entered an order finding that Father "did not sexually molest any of the parties' minor children." Therefore, after more than a year of restricted visitation, Father's regular unsupervised visitation with the children was restored. The trial court ordered counseling for the children and for Mother, Father, and Grandparents.

In October 2001, R.A.K. was taken by Mother to see her pediatrician, Margareete Johnston, M.D. ("Dr. Johnston"). While in the examination room, R.A.K. allegedly volunteered comments to Dr. Johnston's nurse indicating that she had been sexually abused. Upon Dr. Johnston's recommendation, Grandparents brought R.A.K. and H.R.K. once again to the Our Kids clinic for physical examinations. As with the prior examinations, this second round of examinations indicated no sexual abuse.

In December 2001, Father filed a petition asking the trial court to grant him custody of the children. In May 2002, this petition was voluntarily dismissed.

On July 11, 2002, Mother filed a second petition to restrict Father's visitation with the children, based on renewed allegations of sexual abuse.[2] On July 12, 2002, Father signed a "Safety Agreement," agreeing to cooperate with DCS and to suspend his visitation until completion of the investigation into the renewed allegations of sexual abuse.

Meanwhile, on July 12, 2002, Mother took R.A.K. for yet another physical examination, this time at a rape crisis center in Memphis, based on comments that R.A.K. had made to Grandmother. Again, R.A.K. was examined for possible sexual abuse. This examination also indicated that no such abuse had occurred.

On July 22, 2002, approximately two weeks after the filing of Mother's second petition to restrict Father's visitation, the trial judge, Judge Clara W. Byrd, held what was characterized as an "emergency hearing" regarding the new allegations of child sexual abuse. Father filed no response to this second petition prior to the hearing. At the hearing, while discussing preliminary matters, counsel for Father told the trial court:

> We don't think the kids are in a healthy environment in the maternal grandparents' house, and we think that the hatred between the grandparents and the father is damaging the kids. We're going to renew our petition to have the kids removed from that house or to change custody to [Father].

---

[2]The petition also sought a modification in child support.

Counsel for Father later said that, because an earlier petition seeking to award Father custody was dismissed without prejudice, he intended "to refile the same now." Father, in fact, had not filed a written motion for a change in custody with the trial court, but made only an oral motion for such a change in open court.

After that, the hearing commenced, and testimony was heard for three days. During the course of the hearing, R.A.K., who is developmentally delayed, was questioned at length by the trial court and specifically was asked about distinguishing between the truth and a lie. While in a blue room, the trial judge asked R.A.K. whether it would be the truth or a lie to say the room was pink; R.A.K. was not able to discern whether that would be a true statement. H.R.K. had said during her testimony that Father had on two occasions tied her hands and legs to a pole and then sexually abused her. She had said that Father left her tied up, and that her brother D.R.K. came in the room and cut her loose. In his testimony, D.R.K. was initially reluctant to say that H.R.K.'s assertion was untrue, but later relented and indicated that the story of abuse was a "big tale his sister had made up."

After hearing all of the proof, the trial court again concluded that Father did not sexually abuse any of the children. The trial court found specifically that the children's allegations of sexual abuse were not credible. The trial court commented, "That's how serious this case is. These children are telling these lies."

The trial court was concerned that Mother and Grandparents were contributing to the children's creation of false stories of abuse by Father, and that Mother would not take the children to counseling as ordered by the court. Therefore, at the hearing, the trial court ordered that custody of the parties' children be temporarily changed from Mother to Father. Father was ordered to arrange immediate counseling for the children. The trial court prohibited Mother from exercising overnight visitation with the parties' children until she obtained housing of her own, separate from Grandparents. In addition, Grandparents were not permitted to be present during Mother's visitation. The trial court later clarified that it had based its ruling upon Father's "oral petition" requesting custody.

On August 8, 2002, thirteen days after the trial court's oral ruling was issued, Father filed his answer to Mother's petition to restrict visitation, as well as his counter-petition requesting a change in custody and asking that Mother's visitation take place somewhere other than Grandparents' home. On August 12, 2002, the trial court entered a written order temporarily changing custody to Father, concluding that the need for therapeutic counseling and the actions of Mother and Grandparents alienating the affections of the children toward Father required "no less drastic alternative than to award custody of all three children on a temporary basis" to Father.

After the trial court's ruling, Mother filed an application for an extraordinary appeal with this Court pursuant to Rule 10 of the Tennessee Rules of Appellate Procedure. The intermediate appellate court denied this petition.

Mother then sought extraordinary review by the Tennessee Supreme Court. On September 6, 2002, the Supreme Court granted permission for Mother's extraordinary appeal in order to determine whether the trial court erred in transferring custody of the children from one parent to the other at a time when no written petition requesting a change of custody had been filed. In her appeal, Mother also sought to have the Supreme Court remove Judge Byrd from the case.

On November 27, 2002, prior to the Supreme Court's decision on Mother's appeal, Father filed a motion to set child support and the Christmas visitation schedule, and Mother filed a motion for recusal of Judge Byrd. A hearing on both motions was held on December 20, 2002. On December 30, 2002, the trial court entered an order denying Mother's motion for recusal, setting visitation, and naming Gloria Jean Evins ("GAL") as the guardian ad litem for the minor children.

On December 23, 2002, the Tennessee Supreme Court issued its decision on Mother's extraordinary appeal. The Supreme Court held in favor of Mother, determining that Mother's right to due process was violated because, at the time of the trial court's ruling changing custody to Father, there were no pleadings giving Mother notice that the issue of custody would be addressed at the July 2002 hearing. The Supreme Court declined to remove Judge Byrd, finding that she had conducted the proceedings in "an evenhanded manner," and that the trial court's actions did not call into question its impartiality. Therefore, the case was remanded to Judge Byrd "to effect an expeditious return of the children" to Mother. *Keisling v. Keisling*, 92 S.W.3d 374, 380 (Tenn. 2002).

In accordance with the Supreme Court's directive, on January 6, 2003, the trial court ordered the return of the children to Mother, set out visitation for Father, ordered counseling for the children, and set the matter for a final hearing on April 10, 2003. On March 4, 2003, the trial court held a status conference. At this hearing, Judge Byrd recused herself from the case. The Tennessee Supreme Court later entered an order designating Senior Judge William H. Inman to replace Judge Byrd.

On March 27, 2003, Judge Inman held a telephonic pre-hearing conference. The case was continued until June 2003, and Father was directed to add the Grandparents as third-party respondents to the lawsuit as indispensable parties. The trial court ordered that Grandparents timely file and serve responsive pleadings.

On April 24, 2003, Father filed an amended counter-petition to modify custody, asking the court to award custody of the children to him. He also requested that Mother be required to pay his attorney's fees and the entire GAL fee.

On May 21, 2003, Grandparents filed an answer and counterclaim and included a demand for a jury trial. In their counterclaim against Father, Grandparents requested that, "if, and only if, the Court were to change custody of one or more of the minor children, [Grandparents] should be granted liberal visitation with the child(ren) pursuant to T.C.A § 36-6-306, in that denial of visitation would result in irreparable harm to the child(ren)." On June 17, 2003, Mother voluntarily non-suited

her petition to modify Father's visitation.  The trial court denied Grandparents' request for a jury trial.

On June 23, 2003, the trial court conducted a hearing on Father's amended petition to change custody, as well as Grandparents' counterclaim for visitation in the event of a change of custody. At the outset, the trial court denied the Grandparents' request for reconsideration of their demand for a jury trial.[3]

Father testified at the hearing on his own behalf.  He recounted the prior proceedings in which he was accused of sexually abusing the children, noting that the trial court had concluded that the children had not been abused.   Despite the trial court's finding that the allegations were unfounded, he said,  Mother and Grandparents persisted in making allegations of sexual abuse against him. Father maintained that a change in custody was necessary because Mother and Grandparents continued to subject the parties' daughters to repeated rape exams, both at the Our Kids Center and at the rape crisis center in Memphis.  He noted that Mother had not taken R.A.K. to counseling as ordered by the trial court.   Father stated that, since the allegations of sexual abuse arose, the animosity between the parties had greatly increased.  These conditions, Father claimed, would cause irreparable harm to his children.  He requested that any visitation by Grandparents be supervised at the Exchange Club.   He maintained that keeping the children from Grandparents' home would prevent the "irreparable harm done to them by the genital examinations being done to them while in their mother and grandparents' care, mainly the maternal grandmother."

Father testified that during the period of time in which he had primary physical custody of the children, between August 2002 and January 2003,  he took care of the children on a daily basis as a single parent.  When the children were in his custody, Father said, he provided their meals, made sure they went to school and did their homework, and took off work to care for them when they were sick.  He said that the children did well in school while in his custody, and that R.A.K. moved from a special education class to a mainstream class during that time.  Father said that, when he had custody, he took the children to counselor Lori Drake-Bunch ("Drake-Bunch") for court-ordered counseling.   After the counseling, he said, the children had better manners and behavior, and they were more respectful toward him, their peers, and other authority figures. Overall, Father said, his relationship with the children improved during that period of time.

---

[3]Grandparents' attorney asked the trial court to state its reasons for denying the demand for a jury trial, and also asked the trial court for reconsideration of the request, in light of the response filed by Grandparents to a motion to deny the demand for a jury trial:

> MR. HERBISON: I'd respectfully ask for reconsideration of that ruling after Your Honor has taken into consideration the response to the motion.
> THE COURT: I read the responses.  It was interesting.  It was a very nice treatise, Mr. Herbison.  But considering the circumstances of this case, you're not entitled to a jury trial, and that's all I'm going to say.

Father testified that, when the children were told that they had to move back in with Mother after the trial court's January 2003 order, the children "were in tears . . . They wanted to stay with [Father]." After the children were returned to Mother's custody, Father said, they once again became disrespectful to him. Father said that Mother is unwilling to move out of Grandparents' home or care for the children on her own. When the children live with Mother and Grandparents, Father asserted, the children's daily needs were met by Grandmother, not Mother. He observed that Grandmother prepares the children's meals, takes them to school, and takes them to the doctor when needed. Father claimed that, despite the hostilities between the parties, he had continued to foster in the children love and respect for both sides of the family.

Father called as a witness Autumn Moultry ("Moultry"), an investigator with the Davidson County DCS. Moultry testified that, in July 2002, Grandmother contacted DCS to make allegations of child sexual abuse against Father. Moultry said that she conducted an investigation into the allegations, and ultimately determined that they were unfounded.

Counselor Drake-Bunch also testified at trial. She said that Father contacted her to obtain family counseling for the children.[4] Drake-Bunch said that, during one counseling session, R.A.K. told her that Father had not touched her inappropriately, but that Mother had told her to say that he had done so. She testified that R.A.K. used the word "liar" throughout her session in many different ways, referring to family members. Drake-Bunch said that, after she gave a deposition on the evening of December 3, 2002, she was "harassed and intimidated" by counsel for Mother and Grandparents. Consequently, she decided that she would not continue to counsel the children.

Father also called as a witness R.A.K.'s special education teacher in the 2002-2003 school year, Cathy Burgess ("Burgess"). Burgess said that, in October 2002, school committee held a meeting to discuss the proper placement for R.A.K.. Father attended the meeting, but Mother did not. Burgess said that R.A.K. did not need to be in a special education class, so she was moved to a mainstream classroom. She described Father as a very involved parent and said that he called her often and asked a number of questions about R.A.K.'s education. Burgess said that R.A.K. did not exhibit any fear around Father.

Melissa Watson, Father's sister, testified as well. She said that the children did not fear Father, and that they were comfortable with him and showed him natural affection.

Father then called Mother to testify as an adverse witness. She acknowledged that, after the March 2001 hearing, the trial court had ordered Father, Grandparents, and her to attend weekly group therapy with Ray Potts, Ph.D. ("Dr. Potts"). Mother said that they all showed up for a session at Dr. Potts's office as ordered, but that she and Grandparents refused to participate in group therapy because they "wanted to pursue other legal avenues" with a new attorney. Despite the trial court's order that any

---

[4]At the time she couseled the children, Drake-Bunch was working towards becoming a licensed professional counselor.

further allegations of sexual abuse be made to Dr. Potts, R.A.K.'s subsequent allegations of sexual abuse were reported to the DCS, which in turn notified Dr. Potts.

In her testimony, Mother first indicated that the second set of sexual abuse allegations, made in July 2002, were based on police reports and medical records. Mother later conceded that these allegations were precipitated by statements made by R.A.K. to Mother and Grandmother. Mother acknowledged that, by that time, the trial court had found that R.A.K. could not distinguish between the truth and a lie, but Mother justified making new allegations against Father because she believed what R.A.K. had told her. Mother asked rhetorically, "Why would the child make that up?" Mother maintained that it was her duty by law to report her daughter's accusations of molestation to DCS. She believed that the counselor, Drake-Bunch, intentionally lied about R.A.K. telling her that Mother told her to make the allegations against Father. Despite her beliefs about the abuse, Mother no longer sought to restrict the children's visitation with Father.

Mother said that she had no plans to move from her parents' home unless she remarried or began to earn more money. She said that Grandparents had been financially supporting her since the divorce; living in their home, Mother is responsible for paying only the satellite bill and her car insurance. Mother said that she enjoys living with her parents, and that the children love them.

Mother described the daily routine when the children are with her. She said that Grandmother takes the children to school, picks them up, and takes care of them until Mother gets home from work. When Mother gets home, she oversees the children's homework and baths. Mother said that she knew about the meeting at R.A.K.'s school regarding R.A.K.'s placement in school in October 2002, while Father had primary custody, but explained that she did not attend because she had other things to do at home, such as clean up and read through paper work.

Mother admitted that she had previously said that she hated Father. She conceded that she had told the children's schools not to permit Father to pick up the children from school. She acknowledged that, after Judge Byrd awarded Father temporary custody of the children, Mother passed around a petition at her work in an attempt to get Judge Byrd removed from the bench because she awarded custody to Father, an alleged perpetrator of sexual abuse.

The trial court also heard testimony from the social worker at the Our Kids Center in Nashville, Dr. Lisa J. Dupree ("Dr. Dupree"). Dr. Dupree testified about the persistent questioning and examination of the parties' two daughters by Mother and Grandparents, the repeated reports of Father's alleged sexual abuse, and the multiple interviews and physical examinations of the girls at the Our Kids Center, all resulting in a finding of no abuse. Dr. Dupree said that, on the first visit to the clinic by R.A.K. and H.R.K. in May 2000, the girls were interviewed but did not give a history of sexual abuse at that time. She said that she did not subject the girls to repeated interviews, because such questioning compromises the integrity of the investigation.

Dr. Dupree testified that R.A.K. and H.R.K. had each been physically examined three times at the Our Kids clinic. The first examination for both took place in May 2000, when Grandmother brought

the girls to be examined. The visit was prompted by numerous contacts to the clinic by Grandparents and DCS, and the exam was requested by DCS based on allegations that the girls' genitals were red and irritated and concerns that they had been sexually abused by Father and a cousin. The examinations showed no physical signs of sexual abuse. After the May 2000 examinations, the clinic recommended that the children undergo counseling, and that Grandmother discontinue questioning the children regarding sexual abuse. Dr. Dupree explained that repeatedly questioning children regarding sexual abuse is not a good practice, and she was concerned about Grandmother's persistent questioning of the children in this case.

In November 2000, Grandmother brought H.R.K. to the Our Kids clinic for another physical examination. Grandmother reported to Dr. Dupree that H.R.K. had returned from a visit with Father and had indicated that she had been inappropriately touched. Grandmother reported to Dr. Dupree that she had inspected the child's internal genital area with a magnifying glass and had noted what she believed to be injury. After another physical examination, the clinic again found no internal injury indicating sexual abuse. Dr. Dupree recommended that Grandmother refrain from further questioning and discontinue genital examinations of the girls upon return from visits with Father. Dr. Dupree testified that she explained to Grandmother that such exams are counter-productive, and that repeatedly performing genital examinations could itself constitute abuse.

In January 2001, Mother and Grandmother brought R.A.K. to the Our Kids clinic for physical examination. This was prompted by Grandmother's observation of redness, swelling, and possible infection of R.A.K.'s genital area and her concerns of sexual abuse of R.A.K. by Father and an uncle. Grandmother told Dr. Dupree that the children had disclosed some type of sexual abuse to DCS and indicated that she felt that the situation was worsening. After another physical examination, there was again no indication of sexual abuse. Dr. Dupree once again recommended that Mother and Grandparents not question the children and refrain from performing physical examinations on the girls. Mother and Grandmother were both advised that it was not in the best interest of the children to have repeated genital exams.

In April 2001, the trial court issued its finding that no abuse had occurred and that the children's stories of abuse were fabricated. Nevertheless, Dr. Dupree testified that in October 2001, Grandparents brought both H.R.K. and R.A.K. to the Our Kids Clinic for another physical examination. Dr. Dupree's report indicated that, when R.A.K. was told she would undergo another genital examination, she lowered her eyes and said, "Oh, no, not again." Grandparents reported to Dr. Dupree that, upon return from a weekend visit with Father, R.A.K.'s genital area was red and irritated, and she had pain urinating. Grandmother then took R.A.K. and H.R.K. to their pediatrician with suspicions of urinary tract infections, and Grandmother told Dr. Dupree that both H.R.K. and R.A.K. spontaneously reported sexual abuse to the pediatrician's assistant. After another physical examination by the Our Kids Clinic, once again, no physical injury was found in either of the children. Dr. Dupree gave the Grandparents the name of a child counselor for the children, and she also recommended that the entire family, including Father, participate in group therapy. Grandparents were again reminded that repeated questioning and genital exams were harmful to the children.

Dr. Dupree testified that at least one of the girls was admitted to the Vanderbilt Hospital, and, as a part of hospital policy, it contacted Our Kids. Despite Dupree's recommendation that the girls not be subjected to further physical examinations, Mother and Grandparents requested that additional physical examinations of R.A.K. and H.R.K. be performed by an agency other than the Our Kids clinic, because they felt that Our Kids could no longer be objective. Therefore, the additional physical examinations of R.A.K. and H.R.K. were performed by a rape crisis center in Memphis. Dr. Dupree defined sexual abuse as "[t]he touching of a minor child for purposes of sexual gratification," which would include external fondling or oral contact, and Dr. Dupree conceded that this type of abuse would not result in any physical evidence of the inappropriate touching. Consequently, Dr. Dupree acknowledged that, although none of the physical examinations performed on the girls supported a finding of sexual abuse, those findings did not rule out a determination that sexual abuse had occurred. While the behavior of Mother and Grandparents may have been irrational, Dr. Dupree stated, she believed that their claims of sexual abuse of R.A.K. and H.R.K. were sincere and not malicious.

Grandfather testified at trial. He acknowledged being involved in Mother's decision-making in the divorce case. After Mother and Grandparents were ordered by the trial court to participate in group counseling with Dr. Potts, Grandfather said, in advance of meeting with Dr. Potts on April 18, 2001, they had all agreed that he would be the spokesperson for the family. At that meeting, Grandfather told Dr. Potts that the family intended to explore other legal avenues before meeting with him in therapy. Grandfather explained that, at the time, Mother was considering appealing the trial court's order, but because her trial attorney did not handle appeals, she needed time to obtain new counsel for such an appeal. After that visit, Grandfather stated, no more sessions were scheduled with Dr. Potts. Even though they did not actually participate in therapy with Dr. Potts, Grandfather maintained that, by meeting with Dr. Potts on that occasion Mother, Grandmother, and he had complied with the trial court's April 17, 2001 order.

Grandfather asserted that the allegations of sexual abuse by Father were not made by Mother, Grandmother, or him; rather, the allegations of sexual abuse were made by the children. Sometime in 2000, Grandfather said, R.A.K. made a comment to him indicating that she may have been subjected to inappropriate touching. After that, Mother, Grandmother, and he had a family meeting, and decided that R.A.K.'s comment should be reported to R.A.K.'s psychologist at the time. Grandfather defended this decision, stating that he had read a statute that he believed required them to report suspicions of sexual abuse, and he believed they could have been held criminally responsible for failing to report it. Grandfather testified that he was familiar with the law from his eighteen years of experience in criminal law enforcement.[5]

Grandmother testified as well. She denied ever doing anything to encourage the children to falsely accuse Father of sexual abuse, and stated that she still believes the accusations of sexual abuse against him. Grandmother said that, for the children's sake, she tries to cooperate with Father, but said

---

[5]Grandfather stated that he spent four years as a private investigator, and that he was currently an investigator for the Metropolitan Nashville Human Relations Commission, was a mediator for Davidson County Juvenile Court, and was on the Davidson County Juvenile Court's Foster Care Review Board.

that she did not like him and was afraid of him. She recounted an incident in which, she said, Father verbally assaulted her at one of the children's ball games at a time when he was enjoined from coming within a certain distance from her.

The parties' oldest child, D.R.K., who was twelve years old at the time of the hearing, testified in chambers. D.R.K. said that he loved both his parents, but that he would rather continue living with Mother and have visitation with Father. He said that he was happy living with Mother and Grandparents, and that he is close to all of them. D.R.K. testified that Grandparents take care of him while Mother is at work, but that when Mother is home, they "always have a good time." D.R.K. conceded that Father sometime takes time to talk with him about his concerns, but indicated that Mother is available to him "[a]ll the time." He testified that Grandfather also takes the time to talk with him, and that he "get[s] along great" with Grandmother. At the time of the hearing, D.R.K. said, he was visiting Father every Wednesday for about three hours, every Sunday for about five hours, and also every other weekend. He told the trial judge that he would rather have visitation with Father only on every other weekend, because his schoolwork made it difficult to go to Father's home on Wednesdays, and visiting Father every Sunday took him away from Mother every weekend. D.R.K. testified that it was important to him that he be able to stay with his sisters.

D.R.K. described to the trial judge the after-school arrangement in each household. When he lived with Father, D.R.K. said, he attended an aftercare program after school. When he lived with Mother, however, Grandparents took care of him after school. When asked what he thought about the aftercare program at school, D.R.K. replied that one of the counselors almost broke his arm in a dodge ball game using softballs. In contrast, he said that he was never mistreated by Grandparents. As discipline at Grandparents' house, he was either placed in time out or "pretty much the worst is no dessert."

Finally, Father was recalled to testify to rebut Grandmother's testimony. He denied that he had ever assaulted Grandmother, explaining that on one occasion he threw up his fist to defend being punched by her. On another occasion, Father said, when he was talking on the telephone with one of the children, he asked to speak with Grandmother. When the child tried to hand the telephone to Grandmother, Father heard Grandmother say, "I don't want to talk to him; he hurt you all."

At the conclusion of the hearing, the trial court took the matter under advisement. On July 7, 2003, the trial court filed its memorandum opinion. The memorandum opinion crisply summarized the trial judge's impressions of the parties' motives and credibility and his factual and legal conclusions:

> Custody of the three children of these parties (ages thirteen, twelve and seven) was initially awarded to Mother in 1998. She and the children continued to live with her parents. The divorce was acrimonious; the post-divorce relationship even more so, exacerbated by the ever-present voices of the Grandparents. Father now seeks custody. The relevant factors set forth in Tennessee Code Annotated § 36-6-106 have been considered at length.

. . . [Father] claims the judgment should be modified to award him custody of the children because of a material change of circumstances since the initial award of their custody. He asserts that the Mother, in league with her parents, persist in making and lodging false accusations that he sexually abused the oldest daughter, R.A.K.. In this connection, it is pertinent to note that the prevention of child abuse is a priority of this State, Tennessee Code Annotated § 37-1-601. Further, it is pertinent to note that false accusations of sexual abuse have become a reprehensible tool, of sorts, and treated as *de rigueur*, by some ex-spouses who are determined to vent their wrath upon a former mate. The practice is endemic. . . owing, doubtlessly, to its brutal effectiveness.

Judge Byrd, on two occasions, conducted protracted hearings dealing with this issue. She held, in no uncertain terms, that Father did not abuse R.A.K.. Notwithstanding, Mother, in concert with her parents, continued their obsessive efforts to fasten such disgraceful behavior upon Father ["I hate him," she stated in open court; which spoke volumes]. . . .

Mother's expressed hatred of Father, fueled by her parents, seemingly is limitless. Judge Byrd wrestled with the case for years; orders were issued and ignored . . .

Mother and Grandmother testified that they believed R.A.K.'s accusations of abuse, even in the face of incontrovertible evidence that R.A.K. was untruthful. . . . Mother, perhaps like R.A.K., cannot distinguish between truth and untruth, or does not care to do so. With all proper regard for Mother's limitations, she is simply not credible.

The allegations of sexual abuse apparently originated with R.A.K.. There were no objective or corroborative indications or evidence of any abuse — merely statements by R.A.K. that did not conform to the level of her thought processes. *All* of the various officialdom charged with the duty of proactiveness when faced with reports of child abuse endured the Mother's complaints *ad infinitum* until, one-by-one, [R.A.K.'s physician], the State of Tennessee, the local police, realized the truth and closed their files.

\* \* \*

The Court finds that the false accusations of sexual abuse constitute a material change of circumstances which require and justify a change of custody. This change is in the best interest of the children. . . It is clear from the record that Mother — and her advisors — were well aware of the destructive nature of such accusations, but persisted, and continue to persist, borne of their hatred of Father in making the accusations. The children suffer most.

(Citations and footnotes omitted). After reviewing caselaw from Tennessee and other states,[6] the trial court went on:

> . . . The thrust of the opinions of the Courts is that the subjection of a child to repeated and intrusive physical examinations because of the mother's unsubstantiated belief that the child has been sexually abused casts significant doubt upon her capacity to provide for the emotional and intellectual development of the child.
>
> Expert opinions are not required to conclude that repetitious, futile, examinations of R.A.K.'s genitalia were harmful. Common sense will suffice. Her examination by the Grandmother with a magnifier was especially unthinkable, and the practice of repeated exams apparently did not cease after the Mother and Grandmother were warned. Judge Byrd recognized the problem by ordering, in a polite way, Mother to live apart from her parents. And, in this connection Mother made it clear that she will not do so.
>
> The Father's petition for custody of the children owing to a material change in circumstances is supported by a strong preponderance of the evidence, and he is awarded custody of the children. Mother is allowed the same visitation privileges that the Father enjoyed . . . .

Thus, the trial judge looked at Judge Byrd's earlier finding of no abuse and concluded that it was well-founded. The trial court found that Mother's testimony was not credible, and that the continued accusations by Mother and Grandparents were motivated by their undisguised animosity towards Father. It further found that the repeated accusations were destructive of Father's relationship with the children, and that the relentless questioning and intrusive physical examinations of the girls in an effort to substantiate the abuse charges were harmful to them.

Therefore, the trial court changed custody of the children to Father, granted Mother visitation, and ordered Mother to pay child support. The trial court denied Father's request to require that Mother's visitation take place away from Mother's and Grandparents' residence. In addition, the trial court stated that Grandparents' counterclaim for visitation "will stand dismissed, *sua sponte*." The order also provided that the parties were jointly responsible for paying the $15,000 in GAL fees requested. On July 17, 2003, the trial court entered a final order consistent with its memorandum opinion, incorporating that opinion by reference.

On July 18, 2003, Mother and Grandparents filed an objection to the fees of the GAL. They claimed that the GAL failed to perform her duties, that she charged an excessive hourly rate, and that

---

[6]The trial court cited *Masters v. Masters*, 795 So.2d 1271 (La. Ct. App. 2001); *Turner v. Turner*, 260 A.D.2d 953 (N.Y. Ct. App. 1999); *Young v. Young*, 212 A.D.2d 114 (N.Y. Ct. App. 1995); *Beekman v. Beekman*, 645 N.E.2d 1332 (Ohio Ct. App. 1994); *Watson v. Poole*, 495 S.E.2d 236 (S.C. 1997); *Routh v. Routh*, 492 S.E.2d 415 (S.C. 1997).

-13-

the activities for which she charged were either clerical or were not related to the case. On July 23, 2003, Father filed a motion to alter or amend the judgment, asking the trial court to require Mother and Grandparents to pay his attorney's fees and all of the GAL fees.

On July 23, 2003, prior to any response from the GAL, the trial court entered an order reversing its prior decision and limiting the GAL fees to $1,500. The trial court also awarded $70 for court reporter fees paid by the GAL.

On August 1, 2003, the GAL filed a request for time to be permitted to respond to the trial court's July 23, 2003 order. The GAL later filed a motion to reconsider the July 23, 2003 decision. On August 15, 2003, Mother and Grandparents filed a motion to alter or amend the July 17, 2003 order granting Father custody, or for a stay pending appeal. All of the post-judgment motions were denied. Mother, Grandparents, and the GAL all appeal.

On appeal, Mother, Grandparents, and the GAL all raise separate issues. Mother argues that the trial court erred in changing custody to Father under the circumstances because (1) the evidence preponderates against the trial court's determination that a material change in circumstances had occurred since the last order establishing custody of the children; (2) the trial court erroneously permitted the counselor, Drake-Bunch, to testify to a hearsay declaration made by R.A.K.; and (3) changing custody based upon the report by Mother and Grandparents of the girls' complaints of sexual abuse contravenes public policy. Grandparents raise a different issue on appeal, arguing that the trial court erred in denying their request for a trial by jury and in *sua sponte* dismissing their claim for grandparent visitation. Finally, the GAL argues that the trial court abused its discretion in rejecting her fee request of $15,000 and in awarding her only $1,500 in fees, which had already been paid by the parties.

The trial court's findings of fact are reviewed *de novo* on the record, presuming those findings to be correct unless the preponderance of the evidence is otherwise. **Kendrick v. Shoemake**, 90 S.W.3d 566, 570 (Tenn. 2002); **Hass v. Knighton**, 676 S.W.2d 554, 555 (Tenn. 1984); Tenn. R. App. P. 13(d). The trial court's conclusions of law are reviewed *de novo*, with no such presumption of correctness. **Kendrick**, 90 S.W.3d at 569–70.

We first address Mother's argument that the trial court erred in changing custody to Father. When a petition to change custody is filed, the burden is on the parent making the request to show that a material change in circumstances has occurred which makes a change in custody in the child's best interest. **Blair v. Badenhope**, 77 S.W.3d 137, 148 (Tenn. 2002). Thus, the decision on a petition to modify custody involves a two-part test. As a "threshold issue," the trial court must determine whether there has been a change in circumstances since the last custody determination. There are no bright-line rules for determining whether the requisite change in custody has occurred. However, relevant considerations include whether the change (1) has occurred after the entry of the last order sought to be modified; (2) could not be reasonably anticipated at the time the last order was entered; and (3) is one that affects the child in a meaningful way. **Cranston v. Combs**, 106 S.W.3d 641, 644 (Tenn. 2003); **Kendrick**, 90 S.W.3d at 570; **Blair**, 77 S.W.3d at 150. If a material change in circumstances has occurred, the trial court must then proceed to the second step in the analysis, that is, determining whether

-14-

the modification of custody is in the child's best interest in light of the factors enumerated in Tennessee Code Annotated § 36-6-106.[7]  Furthermore, "[a]lthough evidence of substantial harm or harm to the child is certainly relevant to the trial court's determination, the analysis . . . does not require a finding of harm or substantial harm to establish a material change in circumstances." *Cranston*, 106 S.W.3d at 645.

On appeal, Mother first argues that the trial court erred by measuring the change in circumstances from the wrong beginning point, looking at changes that had occurred since the September 1998 divorce

---

[7]Those factors are as follows:

(1) The love, affection and emotional ties existing between the parents and child;

(2) The disposition of the parents to provide the child with food, clothing, medical care, education and other necessary care and the degree to which a parent has been the primary caregiver;

(3) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment; provided, that where there is a finding, under § 36-6-106(8), of child abuse, as defined in § 39-15-401 or § 39-15-402, or child sexual abuse, as defined in § 37-1-602, by one (1) parent, and that a non-perpetrating parent has relocated in order to flee the perpetrating parent, that such relocation shall not weigh against an award of custody;

(4) The stability of the family unit of the parents;

(5) The mental and physical health of the parents;

(6) The home, school and community record of the child;

(7) The reasonable preference of the child if twelve (12) years of age or older. The court may hear the preference of a younger child upon request. The preferences of older children should normally be given greater weight than those of younger children;

(8) Evidence of physical or emotional abuse to the child, to the other parent or to any other person; provided, that where there are allegations that one (1) parent has committed child abuse, [as defined in § 39-15-401 or § 39-15-402], or child sexual abuse, [as defined in § 37-1-602], against a family member, the court shall consider all evidence relevant to the physical and emotional safety of the child, and determine, by a clear preponderance of the evidence, whether such abuse has occurred. The court shall include in its decision a written finding of all evidence, and all findings of facts connected thereto. In addition, the court shall, where appropriate, refer any issues of abuse to the juvenile court for further proceedings;

(9) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child; and

(10) Each parent's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent, consistent with the best interest of the child.

T.C.A. § 36-6-106(a) (2001).

decree. Rather, Mother claims, the trial court should have determined whether there had been a change in circumstances since the order entered on April 17, 2001. This distinction is important, Mother contends, because by April 2001, the allegations of sexual abuse against Father had already been made. Therefore, additional allegations of sexual abuse would not be an unforeseeable change in circumstances. In response, Father argues that the trial court correctly determined that the September 1998 final decree is the touchstone for determining whether a material change in circumstances has occurred. He points out that neither the hearing in March 2001 nor the subsequent order entered in April 2001 resolved any interim petition to modify custody.

Tennessee has long recognized that, when a final decree is entered that adjudicates matters of custody, the decree is *res judicata* and will not be modified absent a change in circumstances that justifies such a modification. ***Kendrick***, 90 S.W.3d at 570; *see also In re E.J.M.*, No. W2003-02603-COA-R3-JV, 2005 WL 562754, at *18 (Tenn. Ct. App. Mar. 10, 2004); ***Hoalcraft v. Smithson***, 19 S.W.3d 822, 828 (Tenn. Ct. App. 1999). Though temporary custody orders may be entered after the entry of the final decree, a change in circumstances is measured from the final order of custody under which the parties are currently operating. *See In re E.J.M.*, 2005 WL 562754, at *18 (measuring a change in circumstances from the entry of the final decree of divorce); ***Spatafore v. Spatafore***, No. E2001-02459-COA-R3-CV, 2002 WL 31728879, at *2 n.1 (Tenn. Ct. App. Dec. 5, 2002) (measuring a change in circumstances from entry of the final decree of divorce, despite existence of post-decree order changing custody temporarily); ***Gorski v. Ragains***, No. 01A01-9710-GS-00597, 1999 WL 511451, at *5 (Tenn. Ct. App. July 21, 1999) (measuring a change in circumstances from "the entry of the presently operative custody decree").

In this case, Mother argues that, prior to the March 2001 hearing, Father had filed a petition for a change of custody, and that the trial court considered that petition and rejected it in the April 2001 order. Thus, she claims, the April 2001 order is the last final order adjudicating custody, and a change in circumstances should be measured from that point. In response, Father contends that his petition for custody was withdrawn before the March 2001 hearing, and that consequently the April 2001 order did not resolve the issue of custody. Therefore, he argues, because there has been no final order regarding custody since the entry of the September 1998 final decree of divorce, the divorce decree is the point in time from which a change in circumstances should be measured.

The appellate record in this cause does not include the pleading filed prior to the March 2001 hearing. The April 2001 order alludes to a "CounterPetition heretofore filed by [Father];" however, the substance of the petition is unclear. Nevertheless, the April 2001 order makes it clear that the trial court did not resolve any issues related to a petition for a change of custody. Rather, the order sets out the trial court's decision to reinstate Father's visitation with the children based on its determination "that Father did not sexually molest any of the parties' minor children as supported by the report of a licensed psychologist . . . and by the results of the polygraph test taken of Father . . ., but that said children have been emotionally abused by both parties and the children's grandparents . . . ." Therefore, regardless of whether Father had filed a petition for a change of custody, that petition was not adjudicated in the April 2001 order. Therefore, the September 1998 final decree is the last final order adjudicating custody

in this case, and a change in circumstances should be measured therefrom.[8]  **See Cranston**, 106 S.W.3d at 645 (measuring a change in circumstances from the "initial custody order," despite the existence of a subsequent order altering the parties' visitation arrangement).

Mother next argues that the evidence preponderates against the trial court's conclusion that the requisite material change in circumstances has occurred. She contends that there was, in fact, no change in circumstances, relying again on her argument that the change should be measured from the April 2001 order.  She claims that a "continuity of circumstances" occurred, because both H.R.K. and R.A.K. accused Father of molesting them before and after the April 2001 order was entered, and therefore further such accusations were not unforeseen.

Mother's argument fails  in light of our determination that the change in circumstances must be measured from the September 1998 decree.  The trial court made extensive findings regarding Mother's and Grandparents' "obsessive efforts" to have Father determined to be a child sex abuser, dating from the time of the first petition to restrict custody in 2000.  This determination was based in large part upon the trial court's assessment of the credibility of the witnesses, and specifically on its credibility determinations against Mother and Grandparents. The trial court was, of course, in the best position to observe the demeanor of the witnesses and to assess their credibility.  Consequently, we are loathe to second-guess the trial court's determination of credibility.  **See Rutherford v. Rutherford**, 971 S.W.2d 955, 956 (Tenn. Ct. App. 1977) (quoting **Gaskill v. Gaskill**, 936 S.W.2d 626, 631 (Tenn. Ct. App. 1996)).  With due deference to the trial court's determinations of credibility, its finding that Mother and Grandparents engaged in persistent unfounded accusations of child abuse constitutes a material change in circumstances that was unforeseen at the time of the final decree and affects the well-being of the children in a meaningful way.  This finding, fully supported in the record, is "all that is required under the first prong of our analysis." **See Cranston**, 106 S.W.3d at 645.

Mother argues that the trial court erred in allowing the girls' counselor, Drake-Bunch, to testify about R.A.K.'s statement that Mother told her to say that Father had sexually abused her, because the statement was impermissible hearsay.  Whether a certain statement is hearsay is a question of law, subject to *de novo* review. **Gibbs v. Robin Media Group, Inc.,** M1999-00820-COA-R3-CV, 2000 WL 1207201, at *2  (Tenn. Ct. App. Aug. 25, 2000).  The challenged testimony of Drake-Bunch is as follows:

> I . . . inquired [of R.A.K.] if her father in any way had ever touched her.  She responded by telling me, 'No, my mom told me to tell Dr. Johnston that my dad had touched me, but he didn't.'  She continued to use the word 'liar' throughout our session.  She used it

---

[8]Because the April 2001 order did not address Father's petition for custody, this case is distinguishable from **Hoalcraft v. Smithson**, 19 S.W.3d 822 (Tenn. Ct. App. 1999), on which Mother relies.  In that case, the trial court entered an order subsequent to the final decree which specifically denied the father's petition for a change in custody based on a lack of the requisite change in circumstances.  Therefore, when a later petition to modify custody was filed, the date of the entry of the post-decree final order was the date from which a change in circumstances was measured. **Hoalcraft**, 19 S.W.3d at 824–25.

in many different ways, as most of her family members, and so that's what she told me regarding the incident.

Mother contends that this testimony should have been excluded at trial because it is either hearsay, offered for the truth of the matter asserted, or it is not relevant. In response, Father argues that this testimony was not hearsay because it was not offered for the truth of the matter asserted; rather, was offered to show that R.A.K.'s statement to Dr. Johnston and Mother was completely different from the statement R.A.K. made to Drake-Bunch, providing a basis on which to challenge the credibility of Mother's claimed belief that R.A.K. was telling the truth when she made the statements about Father's alleged inappropriate touching.

In this case, the trial court did not find that Mother told R.A.K. to accuse Father of sexual abuse. The trial court did, however, find that R.A.K. was incapable of distinguishing between truth and fiction, and noted the "incontrovertible evidence that R.A.K. was untruthful." The statement of Drake-Bunch was relevant to illustrate the point that R.A.K. said one thing to her pediatrician and Mother, but said something different to her counselor. Under these circumstances, the testimony of Drake-Bunch on R.A.K.'s statement would not be deemed hearsay, and the trial court did not err in allowing it.

Mother argues that finding a material change in circumstances based on one parent reporting the other for suspected child sexual abuse is against public policy, because anyone, including a parent, is required by law to report a child's accusations of sexual abuse to the appropriate authorities. Indeed, under the applicable Tennessee statutes, anyone with "reasonable cause to suspect that a child has been sexually abused" is required to report such information to DCS. *See* T.C.A § 37-1-403(a)(3) (Supp. 2004); § 37-1-605(a)(8) (2001). Another Tennessee statute makes it a crime to fail to report such conduct. T.C.A § 37-1-615(a) (2001).

Accusations of child sexual abuse by one parent against the other parent presents one of the most difficult issues faced by a trial court. Suspicion of such abuse must be taken seriously and were investigated thoroughly, for the consequences to the child of allowing any abuse to continue are grave. However, mistakenly concluding that a parent has abused his child, when in fact there has been no abuse, has serious consequences as well, including the almost-certain destruction of the parent-child relationship and disgrace to the accused parent. In addition, determining whether abuse has occurred can be enormously difficult; there is frequently a paucity of physical evidence, and the alleged child victim may be unable to accurately relate pertinent events. Finally, even investigating the accusation is delicate; the suggestibility of the alleged victim is almost invariably an issue, and heavy-handed or repetitive interrogation or physical examination can itself inflict long-lasting trauma on a child.

In this case, it is clear that the accusations of sexual abuse of the parties' daughters were taken seriously and investigated thoroughly. After full investigation and hearing, not once, but twice, Judge Byrd concluded unequivocally that no abuse occurred. Moreover, much of that evidence was reviewed once again by Judge Inman, who reached the same conclusion.

In a case such as this, any concern about reporting allegations of child sexual abuse must be balanced with the awareness that false accusations of such abuse can be a "reprehensible tool" against an ex-spouse, remarkable for its "brutal effectiveness." With appropriate deference to the trial court's determination of the parties' credibility, the record fully supports the trial court's finding that the continued false accusations of abuse by Mother and Grandparents were in fact fueled by their antipathy towards Father, rather than by genuine concern for the children. The relentless interrogation of the children and the intrusive examinations of the girls' genitalia in an effort to obtain ammunition against Father despite the repeated warnings that such actions were harmful, as well as attempts to disgrace Father publicly and intimidate those charged with ascertaining the truth of the accusations,[9] all support the trial court's conclusion.

Against this backdrop, Mother argues that it should be deemed a violation of public policy for the trial court to hold that repeated false accusations of child sexual abuse can constitute a material change in circumstances, sufficient to warrant a change in custody. She seeks to rely on Tennessee Code Annotated §§ 37-1-403(a)(3), 37-1-605(a)(8) and 37-1-615(a), which require anyone with "reasonable cause" to suspect child sexual abuse to report it, and makes the failure to do so a crime. These provisions, however, apply to persons with "reasonable cause" to suspect such abuse. The accusations of sexual abuse against Father ceased being based on "reasonable cause" long ago. The trial judge refused to permit Mother and Grandparents to disguise their vindictiveness toward Father by cloaking their actions with these statutes. We decline to do so as well.

Next, Mother argues that the trial court erred in finding that it was in the children's best interest to change custody to Father. Mother argues that the trial court erred in failing to consider the testimony of the children's pediatrician, Dr. Johnston, given at the July 2002 hearings. In its memorandum opinion, the trial court noted that "Dr. Johnson [sic], who has never testified in this litigation, at some unknown time withdrew his [sic] support for the Mother's insistence . . . ." Mother argues that the trial judges's reference to Dr. Johnston as a male physician, rather than a female, indicated that the trial judge did not review Dr. Johnston's testimony. Mother also contends that the trial court erred in concluding that Dr. Johnston "withdrew" her support for Mother's belief that the parties' daughter had been abused. Rather, Mother argues, Dr. Johnston's testimony showed that she stopped treating the children because of an undisclosed conflict, not because she disagreed with Mother. These alleged errors, however, are peripheral to the primary issues in the case, and in no way indicate that the trial court did not carefully consider all of the evidence. Though Mother complains that Dr. Johnston's July 2002 testimony was not given due consideration, Mother did not call Dr. Johnston to testify at trial, and counsel for Mother stated at the hearing that Mother "was not relying on [Dr. Johnston's report] as a basis for any relief being asked of the Court."

---

[9] Grandparents and Mother insisted on having the children physically examined by the Memphis agency after three negative test results were obtained for both H.R.K. and R.A.K. at the Our Kids clinic, claiming that Our Kids could no longer be objective. Furthermore, Mother admitted to telling the children's school not to allow the children to leave with Father and to passing around a petition at work to have Judge Byrd removed from the bench.

Mother also argues that the trial court's opinion does not indicate consideration of the factors enumerated in § 36-6-106. Had he done so, she asserts, those factors would weigh in her favor, and the trial court would not have concluded that the children's best interest would be served by changing custody to Father.

Mother correctly notes that the trial court did not list and discuss each factor in Section 36-6-106. However, the trial court was not required to do so, and the absence of an explicit discussion of each factor does not mean that they were not considered. At the outset of its memorandum opinion, the trial court stated succinctly that "[t]he relevant factors set forth in Tennessee Code Annotated § 36-6-106 have been considered at length." The trial court then addressed the overriding issue, the effect on the children of Mother's and Grandparents' persistent allegations against Father and their relentless quest for evidence of sexual abuse. We have noted previously the harm that can result to a child when a parent's natural and expected protectiveness regarding the prospect of sexual abuse by the other parent goes beyond reason, becoming obsessive hypervigilance. If permitted to continue, the consequence can be lasting psychological damage to the child and the destruction of a normal parent-child relationship. *See B.M. v. P.R.M.*, M2002-02242-COA-R3-CV, 2004 WL 1853418 (Tenn. Ct. App. Aug. 18. 2004) (noting the harm to the child when the mother and maternal grandmother became convinced, without basis, that the father had sexually abused the daughter; they became hypervigilant about the daughter's contacts with the father, publicly accused the father of child sexual abuse, and ultimately moved out of state to prevent the father from having unsupervised visitation with the daughter).

We find persuasive the analysis in *Watson v. Poole*, 495 S.E.2d 236 (S.C. 1997), cited by the trial court. In that case, the mother lived with the grandmother and had custody of the parties' four-year-old daughter. The mother resented the father's visitation. She allegedly noticed redness in the child's genital area and took her to the pediatrician for an examination. She also reported suspected child sexual abuse to a state agency. No evidence of sexual abuse was found. Despite this, the mother continued to accuse the father of sexually abusing their daughter and subjected her to repeated physical and psychological examinations. The court determined that the mother's conduct was a change in circumstances warranting a change in custody:

> We agree with the Guardian that Mother's persistent focus on the child's sexuality and genitalia is unhealthy. The numerous physical examinations and counseling sessions for unfounded sexual abuse are not in the child's best interest. Also disturbing is the nude role-playing session with Ms. York [a client of Mother's] which Mother condoned. We believe the child's repeated exposure to doctors and therapists has already created serious harm, not only to the child emotionally, but also to the child's relationship with Father. The conditions are inherently injurious to the child's best interest and constitute a change of circumstances warranting a change in custody.
>
> This court also believes a change in custody to Father will serve the child's best interest apart from the unfounded allegations of sexual abuse. We agree with the Guardian that if Anne Marie is ever to develop a viable relationship with her Father, it must be outside the home of the Mother and grandmother.

*Watson*, 495 S.E.2d at 239–40 (footnote and citation omitted). Thus, in *Watson*, the court recognized that the mother's hypervigilance regarding perceived sexual abuse and the repeated exposure of the child to doctors and therapists were not in the best interest of the child and harmed her relationship with the father. The court concluded that, because there was "no reason to believe that [the mother's] conduct will cease," a change of custody was warranted.

In the instant case, the trial court made similar findings that the children had been subjected to repeated, unwarranted physical and psychological examinations at the instigation of Mother and the Grandparents. This behavior continued even after Mother was pointedly warned that it was harmful to her children. The trial court determined that "Mother has failed to cooperate in the rearing of the children . . . . Her unrelenting animosity to Father, and her refusal to obey orders of the Court, tend to show a material change in circumstances surrounding custody of the children . . . ." Even after the court proceedings in which the children's statements were found to be false, and she admitted that she would report to DCS any such statements if they were again made by the children. This admission reveals the risk of continuing destructive behavior if the children remained in Mother's custody in Grandparents' home. Though it is not necessary to show that a risk of substantial harm will result if custody is not modified, such a showing is relevant to the best interest inquiry. *See Cranston*, 106 S.W.3d at 645. Moreover, Father has demonstrated his ability to provide care and support for the children as a single parent, and that he is able to meet their needs on a daily basis. The continued conduct by Mother and Grandparents was clearly harmful to the children and their relationship with Father, and left the trial court with little choice but to designate Father as primary residential parent. Under all of these circumstances, we find that the evidence preponderates in favor of the trial court's conclusion that designating Father as primary residential parent is in the children's best interest.

Grandparents raise issues on appeal, arguing that the trial court erred in rejecting their request for a jury trial, and in dismissing *sua sponte* their counter-petition for grandparent visitation. When Grandparents were joined as parties, they filed a cross-claim against Father for attorney's fees and grandparent visitation pursuant to Tennessee Code Annotated § 36-6-306. In that pleading, Grandparents demanded a jury for "any and all disputed issues of material fact in this matter, whether raised by the mother's initial petition, the father's amended counter-petition, or this cross-claim against the Father" pursuant to Tennessee Code Annotated § 21-1-103. Father filed an answer to the cross-claim, claiming that Grandparents had no standing to demand a jury trial for issues regarding custody of the children previously raised in either Mother's petition or Father's counter-petition or any amendments thereto. The trial court denied Grandparents' demand for a jury trial by order dated June 20, 2003, and again at the hearing on June 23, 2003.

At the hearing below, the trial court bifurcated the grandparent visitation cross-claim, with the issue to be addressed only if Father was successful in his principal claim. Father was awarded a change in custody, but the trial court denied his request to have all visitation exercised by Mother take place apart from Grandparents' residence. In its final order, the trial court dismissed Grandparents' claim for visitation *sua sponte*, without explaining the reasons for the decision.

Under Tennessee Code Annotated § 36-6-306, grandparents are entitled to a hearing to request visitation "if such grandparent visitation is opposed by the custodial parent." T.C.A § 36-6-306 (Supp. 2004). In considering the request for visitation, the trial court determines whether a risk of substantial harm will result to the child based on a "cessation of the relationship" between the grandparents and the child. In this case, however, the trial court denied Father's request to limit Grandparents' access to the children, and there was no "cessation of the relationship" between Grandparents and the children. Mother's testimony at the trial indicates that she intends to live with Grandparents indefinitely, unless she remarries or increases her income dramatically. Therefore, when Mother has visitation with the children in Grandparents' home, Grandparents will have unrestricted visitation with the children as well. Grandparents' relationship with the children is not severed, and their claim for grandparent visitation under Section 36-6-306 has been rendered moot.

Because the issue of Grandparent visitation is moot, there is no basis on which to hold a trial, by bench or by jury. Therefore, Grandparents' claim on appeal that the trial court erred in denying their request for a jury trial is without merit.

Finally, the GAL appeals as well, disputing the trial court's ruling as to her fee. The GAL argues on appeal that the trial court abused its discretion in first granting her fee request of $15,000, and then later rejecting her fee request based on Mother's post-judgment objection without giving her an opportunity to respond to the issues raised in Mother's objection. The trial court further erred, she claims, in refusing to reconsider its decision. The GAL presents five issues on appeal: (1) whether the trial court has the discretion to appoint a GAL; (2) whether the GAL fees can be assessed as discretionary costs; (3) whether the fees requested by the GAL are reasonable; (4) whether the trial court abused its discretion in denying the GAL's fees; and (5) how should the fees of the GAL be apportioned between Father, Mother, and Grandmother. In response, Mother concedes that the trial court had the discretion to appoint the GAL, that the reasonable fees or costs of the GAL can be assessed as discretionary costs, and that the trial court can apportion the costs between the parties as it deems equitable. Thus, Mother claims, the real issue on appeal centers on whether the trial court abused its discretion in denying the amount of fees requested by the GAL. Father does not challenge the amount of fees requested by the GAL, but argues that, if the trial court is reversed on this issue, Mother should pay his portion of the GAL fees, because her false allegations of sexual abuse necessitated the appointment of the GAL.

In awarding guardian ad litem fees in a custody case, the trial court is given wide discretion, and this court will not interfere in the exercise of that discretion absent a clear showing of abuse. *Kahn v. Kahn*, No. W2003-02611-COA-R3-CV, 2005 WL 1356449, at \*2 (Tenn. Ct. App. June 6, 2005); *Salisbury v. Salisbury*, 657 S.W.2d 761, 770 (Tenn. Ct. App. 1983). The trial court's denial of a motion to reconsider is also reviewed for an abuse of discretion. *See Mitchell v. Mitchell*, No. E2002-03030-COA-R3-CV, 2003 WL 22469809, \*3-\*4 (Tenn. Ct. App. Oct. 31, 2003). The Supreme Court has explained the scope of our review under this standard:

> Under the abuse of discretion standard, a trial court's ruling "will be upheld so long as
> reasonable minds can disagree as to [the] propriety of the decision made." A trial court

abuses its discretion only when it "applie[s] an incorrect legal standard, or reache[s] a decision which is against logic or reasoning that cause[s] an injustice to the party complaining." The abuse of discretion standard does not permit the appellate court to substitute its judgment for that of the trial court.

*Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001) (citations omitted). "When reviewing a discretionary decision by the trial court, the 'appellate courts should begin with the presumption that the decision is correct and should review the evidence in the light most favorable to the decision.'" *Williams v. Williams*, No. E2004-00423-COA-R3-CV, 2005 WL 1219955, at *4 (Tenn. Ct. App. May 24, 2005) (quoting *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 709 (Tenn. Ct. App. 1999)). Thus, a discretionary decision should be set aside "only when the decision is based on a misapplication of the controlling legal principles or on a clearly erroneous assessment of the evidence." *Overstreet*, 4 S.W.3d at 709.

A review of the history of the GAL's involvement in the case is helpful to an understanding of the issues on appeal. The GAL was appointed by Judge Byrd *sua sponte* at the December 2002 hearing on Father's motion to set child support and Christmas visitation and on Mother's motion for a recusal of Judge Byrd. The GAL was appointed because of "all of the accusations going back and forth" between the parties. When Judge Byrd asked the parties whether they objected to the appointment of a GAL, counsel for Mother responded that he thought that the children "should have had a [GAL] a long time ago." Judge Byrd stated on the record that she was appointing the GAL because "there is just so much animosity here, I need somebody to step in and file pleadings if the children need assistance and make sure both sides get it. . . . I want you [GAL] to be able to see these children and make sure they're okay." The trial judge further stated that "if any pleadings need to be filed on their behalf, you'll be doing that." Judge Byrd requested that the GAL "determine what counseling you think these children may need or what assessments they may need." The parties were ordered to pay the GAL a $1,000 retainer because Judge Byrd anticipated that the GAL would "have some time in this case." On December 30, 2002, the trial court entered an order stating that the GAL "shall investigate the case and she shall be empowered to file pleadings on behalf of the minor children, as may be advisable or necessary."

Immediately after her appointment, the GAL began executing her duties. The record reflects that she performed a variety of tasks, including meeting with the parties, reviewing the case file, preparing orders, attending hearings, interviewing the children, contacting the children's schools, and meeting with Drake-Bunch about the children.

On March 14, 2003, Judge Byrd recused herself from the case and was replaced with Judge Inman. The record reflects that Judge Inman expressed uncertainty as to why the GAL was appointed. The GAL was present at the trial below, and was prepared to question witnesses to establish a change in circumstances and the best interest of the children. At the outset of the proceedings, Judge Inman stated to the GAL:

> [T]he Court is going to treat you as counsel for the children. . . . [T]here's a vast difference between a guardian ad litem on the one hand and counsel for the children on

-23-

the other hand. . . . I have no interest in your duties as guardian ad litem, not at all, but I do have some interest in your duty as counsel for the children.

The GAL asked for clarification of her role in the case:

> And then, Your Honor, I have one other question before you start looking at those, and I apologize. My impression from my work in Juvenile Court was that when I'm the attorney for the children, I represent what the children want, whereas if I'm the guardian ad litem, I represent what I think is in the best interest of the children. I was appointed guardian ad litem in this case originally. Am I to understand that you're changing my role today, or have I misunderstood the definition of my role?

Judge Inman responded, "I'm not changing your role. Your role is whatever it is. I choose to consider you as counsel for the children." The GAL was present throughout the trial, but her questioning of witnesses was somewhat limited. She explains now that this was because the questioning by Father's counsel was thorough, and Judge Inman indicated that he did not want repetitious testimony.

After the trial, the GAL submitted an affidavit and requested fees. The affidavit indicated that she spent a total of 105.5 hours on this case, and that she charged $150 per hour, for a total fee of $15,825. The GAL also requested reimbursement for a court reporter fee of $70. The parties had already paid $1,500 of the fees, so the GAL requested that a total of $14,395 be awarded. The GAL attached her fee bill to the affidavit describing her activities and the amount of time spent on the case.

Initially, the trial court granted the GAL the amount of fees requested in her affidavit. In the trial court's July 7, 2003 memorandum opinion, the court stated, "The parties will jointly pay the fee of the Guardian Ad Litem, who has filed her affidavit. If either party objects to the requested fee of $15,000, file objections in writing stating the reasons therefore [sic]." In its July 17, 2003 order, the trial court again indicated that "the parties shall jointly pay the fee of the Guardian ad litem in accordance with her *Affidavit* filed with the Court."

The next day, on July 18, 2003, Mother and Grandparents filed an objection to the fees of the GAL, claiming that the GAL failed to perform her duties, that she charged an excessive hourly rate, and that the activities for which she charged were either clerical or were not related to the case. Mother's objection contained excerpts from the GAL's deposition taken on June 12, 2003, in which the GAL indicated that she had not conducted a home study, was not familiar with the children's teachers, and did not know other basic information about the children that a guardian should know to fulfill her responsibilities as a guardian ad litem. On July 23, 2003, Father filed a motion to alter or amend the judgment. Father did not object to the GAL's fees, but he asked the trial court to require Mother and Grandparents to pay the total guardian ad litem fee awarded.[10] On July 23, 2003, before the GAL had responded to Mother's motion, the trial court entered an order denying the GAL's request for fees and

---

[10]Father also requested attorney's fees.

determining that the $1,500 that had already been paid to the GAL was "adequate compensation for services in this case." The trial court explained:

> It was not clear to the undersigned why a guardian ad litem was appointed for these children, although such action is perfectly legitimate. . . .
>
> For purposes of the trial before the undersigned, the guardian ad litem was treated as the attorney for the children, mostly to off-set any belief that the children's interest could be protected only by a guardian.
>
> I have reviewed the paperwork submitted by the guardian ad litem, most of which deals with the preparation of the case for trial, or with procedural aspects, none of which concerns a guardian ad litem, *keeping in mind that the Court has no authority to appoint counsel in a civil matter*.
>
> It should be noted that the guardian ad litem has been paid $1,500.00, which is deemed to be adequate compensation for services in this case. . . . It is pertinent to observe that the claimed services of the guardian ad litem were of no assistance to the Court.

(Emphasis added.) Thus, the trial court told the GAL that she would be treated as counsel for the children at trial, and determined that much of the GAL's tasks dealt with aspects of the case not within the duties of a GAL. The trial court made its decision while "keeping in mind that the Court has no authority to appoint counsel in a civil matter."

On August 1, 2003, the GAL filed a notice requesting time to be allowed to respond to the July 23, 2002 order entered by the trial court before a hearing was set or a decision rendered on Father's motion to alter or amend. On August 7, 2003, the GAL filed a motion to reconsider the GAL fee award. In that motion, the GAL outlined her position in detail, explaining, among other things, that she was appointed as a GAL by Judge Byrd, that she had spent numerous hours on the case at Judge Byrd's direction, and that her rate of $150.00 per hour was a reasonable rate for attorneys in Wilson County. On August 8, 2003, the trial court denied Father's motion to alter or amend. On August 20, 2003, the trial court denied the GAL's motion to reconsider.

We must now determine whether, under these circumstances, the trial court abused its discretion in granting the GAL only $1,500.00 of her requested fees. Under Rule 17.03 of the Tennessee Rules of Civil Procedure, the trial court has the authority to appoint a guardian ad litem to represent a minor "who does not have a duly appointed representative, or whenever justice requires." Tenn. R. Civ. P. 17.03; *see also* Tenn. R. Civ. P. 54.04 (listing guardian ad litem fees as costs to be included in the bill of costs prepared by the clerk). Rule 17.03 also provides that, "[t]he court may in its discretion allow the guardian ad litem *a reasonable fee* for services, to be taxed as costs." Tenn. R. Civ. P. 17.03 (emphasis added); *Perdue v. Green Branch Mining Co.*, 837 S.W.3d 56, 60–61 (Tenn. 1992).

In addition, because the GAL in this case was asked by Judge Byrd to perform the duties of a guardian ad litem, and was then asked by Judge Inman to perform the duties of an attorney ad litem, a brief overview of the differing roles may be helpful:

> In a custody dispute, the attorney representing each of the competing adults must zealously represent the interests of that client. The interests of the adults are not always consistent with the best interests of the child. The court, however, is empowered to appoint a representative for the child in the form of a guardian *ad litem* or an attorney *ad litem*. The guardian *ad litem* may be an attorney or a specially trained non-lawyer such as the Court-Appointed Special Advocates (CASA). The role of the guardian *ad litem*, whether attorney or non-attorney, should be the same --- to protect the child's interest and to gather and present facts for the court's consideration. The role of the attorney *ad litem*, however, should be that of any other attorney --- to represent and advocate the child's interests before the court, including the calling and cross-examining of witnesses, etc. The guardian *ad litem* may testify, the attorney *ad litem* should not. The guardian *ad litem* is guided by the child's best interest, irrespective of the child's wishes; the attorney *ad litem* should advocate the wishes of the client, assuming the child is sufficiently mature to make such a decision. Unfortunately, Tennessee does not have a statute that clarifies the different roles of the guardian *ad litem* and the attorney *ad litem*. Consequently, the roles have been blurred, especially when an attorney is appointed as a guardian *ad litem*.

JANET LEACH RICHARDS, RICHARDS ON TENNESSEE FAMILY LAW § 8-7, at 232 (2nd ed. 2004) (footnotes omitted).

In Tennessee caselaw, the reasonableness of guardian ad litem fees has rarely been the subject of dispute. Rather, the dispute about guardian ad litem fees is ordinarily related to which party is responsible for paying the fee, or whether the appointment of a guardian was necessary. *See*, *e.g.*, *Kahn*, 2005 WL 1356449, at *5 n.10 (noting that the amount of fee not in dispute); *Placencia v. Placencia*, 3 S.W.3d 497, 503–04 (Tenn. Ct. App. 1999) (awarding guardian ad litem fees when neither party requested the appointment of the guardian ad litem; no challenge to reasonableness of fees); *Anderson v. Memphis Hous. Auth.*, 534 S.W.2d 125, 129 (Tenn. Ct. App. 1975) (affirming fee when defendant argued that appointment of guardian was unnecessary, noting that "no complaint is made as to the amount of the guardian's fee").

In other jurisdictions, the reasonableness of a guardian ad litem's fee has been determined by considering the same factors used in determining the reasonableness of attorney's fees. *See, e.g., Simon v. York Crane & Rigging Co.*, 739 S.W.2d 793, 794 (Tex. 1987); *Goodyear Dunlop Tires N. Am., Ltd. v. Gamez*, 151 S.W.3d 574, 580 (Tex. App. 2005). In Tennessee, to determine whether requested attorney's fees are reasonable, a trial court normally considers the factors enumerated in *Connors v. Connors*, 594 S.W.2d 672, 677 (Tenn. 1980), and in Tennessee Supreme Court Rule 8, Rule of Professional Conduct ("RPC") 1.5. The factors set out in *Connors* include: the time devoted to performing the legal service; the time limitations imposed by the circumstances; the novelty and difficulty of the questions involved; the skill requisite to perform the legal service properly; the fee

customarily charged in the locality for similar services; the amount involved and the results obtained; and the experience, reputation, and ability of the lawyer performing the legal service. ***Connors***, 594 S.W.2d at 676.  Supreme Court Rule 1.5 lists similar, but not identical, criteria:

>  (a) A lawyer's fee and charges for expenses shall be reasonable. The factors to be considered in determining the reasonableness of a fee include the following:

>  (1) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

>  (2) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

>  (3) The fee customarily charged in the locality for similar legal services;

>  (4) The amount involved and the results obtained;

>  (5) The time limitations imposed by the client or by the circumstances;

>  (6) The nature and length of the professional relationship with the client;

>  (7) The experience, reputation, and ability of the lawyer or lawyers performing the services;

>  (8) Whether the fee is fixed or contingent;

>  (9) Prior advertisements or statements by the lawyer with respect to the fees the lawyer charges; and

>  (10) Whether the fee agreement is in writing.

Tenn. Sup. Ct. R. 8, RPC 1.5 (2005).

As in this case, the purpose for which a guardian ad litem is appointed must frequently be vague in order to afford the guardian ad litem the leeway to investigate and determine where the best interest of the children lie.  It is often a difficult and delicate task, and the person appointed is frequently someone in whom the trial judge has some confidence.  Doing the job well can sometimes unavoidably entail work that turns out to be unnecessary or duplicative of work done by the parties' attorneys.

By the same token, however, the breadth of the discretion afforded a guardian ad litem to determine the duties which are necessary has the potential to lead to abuse of that discretion, as where the guardian ad litem undertakes tasks or assumes a role that is overly-expansive, not useful, or

otherwise inappropriate.[11] Therefore, the court must exercise supervisory authority over even the guardian ad litem, and the parties should not be required to pay the guardian's fees for work that was inappropriate or not useful. This should not, however, be judged with the benefit of hindsight, but rather from the perspective of a guardian who may not be able to determine what tasks are necessary until he has undertaken substantial investigation.

From a review of the trial court's order and the comments at trial, it appears that its decision to reject the GAL's fee request was based on two findings: that the GAL's services as a guardian ad litem were of no assistance, and that the GAL's services as counsel for the children were not compensable because the trial court had no authority to appoint counsel in a civil matter. The first reason is, of course, an appropriate factor to consider, since the trial court is in the best position to determine whether the GAL's services were of assistance to the court. The latter observation, however, is erroneous, in that it ignores the specific language in Rule 17.03, which gives a trial court authority to appoint a guardian ad litem for a minor child and to award the guardian a reasonable fee for the services provided. Tenn. R. Civ. P. 17.03; *see also Brown v. Brown*, No. 02A01-9709-CV-00228, 1998 WL 760935, at *9 (Tenn. Ct. App. Nov. 2, 1998). Whether the GAL provided services as a guardian ad litem or an attorney ad litem, the services are compensable under Rule 17.03. In light of this, we must vacate this decision and remand to the trial court for reconsideration of the GAL's fee. On remand, the trial court should also consider the other factors set out in *Connors* and in RPC 1.5, set out above, in making its ultimate determination. In light of this conclusion, we need not address Father's argument that Mother should pay the entire GAL fee. The trial court may address this issue on remand, if necessary.

In sum, the trial court is affirmed with respect to the designation of Father as primary residential parent and its decisions as to grandparent visitation. The decision of the trial court regarding the GAL's fees must be vacated and remanded for reconsideration.

The decision of the trial court is affirmed in part, vacated in part, and remanded, as set forth above. Costs on appeal are to be taxed to Appellants Sharon Marcel Keisling, Francisco (Frank) Humberto Guzman, and Billie Ann Guzman, and their sureties, for which execution may issue, if necessary.



HOLLY M. KIRBY, JUDGE

---

[11]This may occur where, for example, the guardian ad litem assumes the role of an arbitrator or special master of sorts, in effect determining the outcome of lesser disputes between the parties, or gives directions to persons such as school personnel without obtaining court approval, or determines which one of the parties should prevail and in effect becomes another attorney for that party. This is sometimes done with the tacit approval of the trial court where, for example, the guardian ad litem's actions may diminish the number of disputes the trial judge is asked to decide; it is nevertheless beyond the purview of the traditional role of the guardian ad litem. The record in this case does not reflect that the GAL undertook tasks or roles that were inappropriate.