# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### January 22, 2015 Session

## STATE OF TENNESSEE v. HAROLD FRANCIS BUTLER

**Appeal from the Criminal Court for Hamilton County**
**No. 280013     Don W. Poole, Judge**

---

**No. E2014-00631-CCA-R3-CD - Filed May 11, 2015**

---

The defendant, Harold Francis Butler,[1] appeals his Hamilton County Criminal Court jury convictions of felony murder, attempted especially aggravated robbery, attempted first degree murder, and employing a firearm during the commission of a dangerous felony, challenging the trial court's denial of his pretrial motion to dismiss based upon the failure to collect certain evidence. In addition, the defendant claims the trial court erred by denying the defendant's request to call certain witnesses, by permitting the State to impeach its witness and to introduce evidence through a prior recorded statement, and by limiting the defendant's ability to cross examine a witness at trial. Discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which D. KELLY THOMAS, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Jay A. Perry, Chattanooga, Tennessee, for the appellant, Harold Francis Butler.

Herbert H. Slatery III, Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; William H. Cox, District Attorney General; and Cameron Williams and Lance Pope, Assistant District Attorneys General, for the appellee, State of Tennessee.

---

[1]The indictment indicates the defendant's name as "Harold Francis Butler, alias Harold Butler, III, alias Harold Francis," and, in addition, the defendant's name appears as "Harold Francis Butler, III" in various documents contained in the record. Nothing in the record indicates, however, that the indictment, which says "Harold Francis Butler," was amended. As is the policy of the court, we utilize the spelling contained in the indictment.

## OPINION

In April 2011, the Hamilton County Criminal Court grand jury charged the defendant, as well as Steven Ballou, Unjolee Tremone Moore, and John Thomas Simpson, with one count each of first degree premeditated murder, felony murder, attempted especially aggravated robbery, attempted first degree murder, and employing a firearm during the commission of a dangerous felony, all arising out of the murder and attempted robbery of Bernard Hughes and the attempted murder of Tim Westfield. The trial court conducted a jury trial in September 2013.

The State's proof at trial showed that on the evening of June 28, 2010, Timothy Westfield, Myra Collier, and Cindy Cross were visiting their friend, Bernard Hughes, at his apartment on Oakwood Drive in Chattanooga. Shortly before 11:00 p.m., someone knocked on Mr. Hughes's front door. Mr. Hughes looked through the peephole on the door and turned back to Mr. Westfield with a "peculiar" look on his face. Mr. Hughes then opened the front door. Mr. Westfield testified that he saw two men standing outside the front door; one man, later identified as the defendant, was wearing a ski mask, a black baseball cap, a black jacket, and black pants, and that man ordered Mr. Hughes to "lay it down," which Mr. Westfield interpreted to mean that the men were there to rob Mr. Hughes. Mr. Westfield identified the other man as John Simpson.

Mr. Hughes immediately ran outside and closed the front door behind him. Mr. Westfield instructed Ms. Collier and Ms. Cross to go upstairs, and Mr. Westfield hurried outside. As soon as Mr. Westfield appeared outside, he noticed that Mr. Hughes was attempting to fight off both of the would-be robbers. The defendant then raised a handgun and fired two shots at Mr. Westfield, striking him in his left forearm and right ring finger. Mr. Westfield briefly lost consciousness. When he regained consciousness, he saw a silver Nissan Maxima pull up, saw someone get into the Maxima, and saw the car pull away. Mr. Westfield attempted to render aid to Mr. Hughes, who was lying in a pool of blood on the front porch just outside his front door, and Mr. Westfield yelled for Ms. Collier and Ms. Cross to call 9-1-1. Mr. Westfield retrieved a blanket from the sofa in Mr. Hughes's apartment and used it to cover Mr. Hughes's body. The medical examiner, Doctor James Metcalfe, testified that gunshot wounds to Mr. Hughes's head and chest caused his death and that the manner of death was homicide.

Mr. Westfield testified that he had never seen Mr. Simpson prior to June 28 but that he had seen the defendant on several prior occasions, including during the time period in which both the defendant and Mr. Westfield had attended barber college together. Mr. Westfield admitted at trial that he initially told law enforcement officers that he did not know either of the men who attempted to rob Mr. Hughes, but he later identified the defendant,

explaining that both he and the defendant have very distinctive eyes and noses. Mr. Westfield stated that he was "an artist" and that he paid "very close attention to detail." Mr. Westfield explained that he and the defendant both share a "high bridge" on their noses, which, according to Mr. Westfield, is uncommon among African-Americans and is usually a sign of "Indian heritage."

Chattanooga Police Department ("CPD") Officer Ken Burnette testified that, when he responded to the crime scene on June 28, he collected two .45-caliber shell casings and one live round of .45-caliber ammunition. He also collected one size-eight athletic shoe and a white baseball cap. He later processed a gold Nissan Maxima owned by Unjolee Moore. In the trunk of the Maxima, Officer Burnette found a pair of size eight-and-a-half Jordan athletic shoes and a ski mask, and he located a light blue bandana on the rear floorboard of the vehicle. Mr. Westfield testified that the size-8 shoe collected from the crime scene belonged to the defendant. Ms. Collier explained that Steven Ballou was her ex-boyfriend and that she knew Mr. Moore only by association. Ms. Collier recalled that on one prior occasion, Mr. Moore and Mr. Ballou had stopped by Mr. Hughes's apartment when Ms. Collier was visiting him. Ms. Collier testified that she did not know either Mr. Simpson or the defendant.

John Simpson testified as a witness for the State and denied that he knew who had killed Mr. Hughes. Over the defendant's objection, the trial court allowed the prosecutor to introduce the prior recorded statement Mr. Simpson made to law enforcement officers on July 15, 2010, in which Mr. Simpson stated that the defendant had, in fact, shot and killed Mr. Hughes.

CPD Sergeant Michael Wenger testified that, following an interview of Mr. Moore, he obtained arrest warrants for Mr. Simpson and the defendant. The defendant turned himself in to authorities on July 14, and Mr. Simpson was arrested on that same date. Sergeant Wenger interviewed Mr. Simpson on July 15 after fully advising him of his rights, and Mr. Simpson executed a written waiver of those rights. Sergeant Wenger testified that he did not threaten or coerce Mr. Simpson and that he did not discuss any potential "deals" with Mr. Simpson prior to his statement.

With this evidence, the State rested. Following the trial court's denial of the defendant's motion for judgments of acquittal and a *Momon*[2] colloquy, the defendant chose not to testify but did elect to present proof. Doctor Jeffrey Neuschatz, a professor of psychology at the University of Alabama at Huntsville, testified as an expert in the area of eyewitness identification. Doctor Neuschatz addressed the fallacies inherent in eyewitness

---

[2] *State v. Momon*, 18 S.W.3d 152, 161-62 (Tenn. 1999).

identification and explained the concept of unconscious transference, wherein a person views a suspect in a lineup and selects that individual simply because the suspect looks familiar but not because the suspect actually committed the crime.

Based on this evidence, the jury convicted the defendant as charged of felony murder, attempted especially aggravated robbery, attempted first degree murder, and employing a firearm during the commission of a dangerous felony.[3] The trial court imposed an automatic sentence of imprisonment for life. Following a sentencing hearing, the trial court sentenced the defendant as a standard offender to concurrent sentences of 12 years for the attempted especially aggravated robbery conviction and 25 years for the attempted first degree murder conviction, to run consecutively to the life sentence. In addition, the trial court sentenced the defendant to six years' incarceration for the conviction of employing a firearm during the commission of a dangerous felony, to be served consecutively to the 25-year sentence, for a total effective sentence of life plus 31 years.

Following the denial of his timely motion for new trial, the defendant filed a timely notice of appeal. In this appeal, the defendant challenges neither the sufficiency of the convicting evidence nor the propriety of his sentence, arguing only that the trial court made several erroneous constitutional and evidentiary rulings. Specifically, the defendant contends that the trial court erred by denying his motion to dismiss for the State's failure to collect evidence; by refusing to allow the defendant to call certain witnesses at trial regarding the failure to collect evidence; by allowing the State to impeach Mr. Simpson and to introduce evidence of Mr. Simpson's prior inconsistent statement; and by impermissibly limiting the defendant's cross-examination of Mr. Simpson. We consider each claim in turn.

*I. Failure to Collect Evidence*

The defendant first contends that the trial court erred by denying his motion to dismiss and his subsequent motion to reconsider the dismissal due to the State's failure to collect a cellular telephone that once belonged to the defendant. The defendant argues that the State's failure to preserve this potentially exculpatory evidence resulted in a due process violation. The State responds that no duty to preserve the telephone existed and that, as such, no due process violation occurred.

At the April 2012 hearing on the defendant's motion to dismiss, Sergeant

---

[3]The parties agree and the transcript reflects that the State did not proceed to trial on the charge of first degree premeditated murder, although it is unclear from the record how or when this charge was dismissed.

Wenger[4] testified that, on July 13, 2010, he was contacted by CPD Investigator Crider, who informed him that he had located the defendant's cellular telephone at a residence at 2004 Curtis Street and that the telephone was in the possession of Antonio Watkins. When Sergeant Wenger arrived at the Curtis Street address, he was approached by Captain McPherson,[5] who instructed him "not to take the phone and to not question anyone about it" because "he thought the [federal] marshals needed it." A short time later, Sergeant Wenger received a call from Sergeant Bill Phillips. Sergeant Phillips stated that he had received a call from Sergeant Wenger's superior, Lieutenant Eidson, who had instructed Sergeant Phillips to tell Sergeant Wenger to comply with Captain McPherson's order.

Sergeant Wenger later spoke with the federal marshals on the scene, and the marshals stated that they no longer needed the cellular telephone; the marshals then relayed this information to Captain McPherson. Captain McPherson then told Sergeant Wenger that he was permitted to interview Mr. Watkins about the telephone but that he was not permitted to take possession of the telephone. After speaking with Mr. Watkins, Sergeant Wenger learned that Mr. Watkins had purchased the telephone on approximately July 10. Sergeant Wenger attempted to review the contents of the cellular telephone, and he did find "some pictures of [the defendant] on the phone," but the photographs were not related to the case, and because he was unfamiliar with the operation of the telephone, Sergeant Wenger was unable to locate or review any text messages or any other stored data. Sergeant Wenger confirmed that this was the first occasion on which he had been ordered not to collect potential evidence.

Sergeant Phillips testified that Lieutenant Eidson had called him and requested that he contact Sergeant Wenger to tell him "to leave the phone alone." Sergeant Phillips immediately contacted Sergeant Wenger and relayed the message. Sergeant Phillips admitted that, in 23 years in law enforcement, he could not recall any other occasion on which he had been asked to inform someone not to collect evidence.

Captain McPherson testified that Ms. Collier was his niece and that he was aware that she had been present at the scene of the murder but that he could not recall if she had contacted him regarding this case. Captain McPherson did not recall ordering anyone

_____

[4]At the time of the April 2, 2012 hearing on the motion to dismiss, Sergeant Wenger was a homicide detective in the CPD major crimes division, and at some point prior to the September 2013 trial in this case, he was promoted to the position of sergeant. For ease of reference, we will refer to Sergeant Wenger by his most recent title.

[5]Captain McPherson was promoted from the position of lieutenant to that of captain in February 2012. Although he was still a lieutenant at the time of his pertinent interactions with Sergeant Wenger in 2010, we will refer to him as Captain McPherson for ease of reference.

not to recover a cellular telephone, although he admitted it was possible that he had so instructed Sergeant Wenger. Captain McPherson denied having any information about the potential data contained on the cellular telephone at issue. Captain McPherson admitted that he was the highest-ranking officer on the scene on July 13, 2010, but testified that he was simply "observing" and that a telephone at the scene "was irrelevant" to him.

Antonio Watkins testified that he knew the defendant "from the neighborhood." According to Mr. Watkins, he purchased the cellular telephone from someone whose name he could not recall at the Okey Dokey market on approximately July 11, 2010. Mr. Watkins denied purchasing the telephone from the defendant and denied telling law enforcement officers the same. Mr. Watkins testified that "everything was clear when [he] got the phone," stating that there were no photographs or other data stored on it when he purchased it. Mr. Watkins stated that he no longer owned the telephone, and he did not recall stating that he had purchased the telephone in exchange for "two dime bags of marijuana."

Sergeant Wenger testified as a rebuttal witness and stated that Mr. Watkins had agreed to allow him to examine his telephone on July 13. At that time, Mr. Watkins told Sergeant Wenger that a white Nissan Altima pulled up to him on Roanoke Street; a white female was driving and the defendant was in the passenger seat. Mr. Watkins told Sergeant Wenger that the defendant offered to sell him the telephone in exchange for two "dime bags" of marijuana, and Mr. Watkins agreed to make the trade. Sergeant Wenger confirmed that he saw at least one photograph of the defendant on the telephone.

The trial court denied the defendant's motion to dismiss, finding that any potentially exculpatory data contained within the telephone was "entirely speculative" and that, therefore, the State had no duty to preserve the telephone. The defendant then filed a motion to reconsider, and the trial court conducted a brief hearing on the motion, at which only Sergeant Wenger testified. Sergeant Wenger stated that, just days prior to the April hearing on the motion to dismiss, Captain McPherson told him that "the reason he had instructed [Sergeant Wenger] not to take the phone was because it was in the possession of Antonio Watkins and [Captain McPherson] didn't feel like we had legal standing to take it at the time." Captain McPherson made this statement in the presence of Investigator Narramore,[6] who told Captain McPherson, "all you can do is tell the truth." The defendant argued that Captain McPherson's statement was contrary to his testimony at the April hearing, in which he stated that he did not recall ordering anyone to not collect the telephone and that he did not know why he would have given such an order. The trial court denied the motion to reconsider, finding that, "[e]ven if [Captain McPherson] was acting in bad faith,

---

[6]Investigator Narramore's first name is not clear from the record.

. . . both the [S]tate's duty to preserve the cell phone in issue and the exculpatory nature of the phone are entirely speculative" and that "a trial without the phone will not be fundamentally unfair."

In *State v. Ferguson*, our supreme court "explained that the loss or destruction of potentially exculpatory evidence may violate a defendant's right to a fair trial." *State v. Merriman*, 410 S.W.3d 779, 784 (Tenn. 2013) (citing *State v. Ferguson*, 2 S.W.3d 912, 915-16 (1999)). The court observed that "the due process required under the Tennessee Constitution was broader than the due process required under the United States Constitution" and rejected the "bad faith" analysis espoused by the United States Supreme Court, *Merriman*, 410 S.W.3d at 784-85 (quoting *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988) (holding "that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law")), in favor of "a balancing approach in which bad faith is but one of the factors to be considered in determining whether the lost or destroyed evidence will deprive a defendant of a fundamentally fair trial," *Merriman*, 410 S.W.3d at 785. The supreme court "observed that fundamental fairness, as an element of due process, requires a review of the entire record to evaluate the effect of the State's failure to preserve evidence." *Id.* at 784-85 (citing *Ferguson*, 2 S.W.3d at 914, 917).

To facilitate this "balancing approach," our supreme court ruled that the trial court must first "determine whether the State had a duty to preserve the evidence," *Merriman*, 410 S.W.3d at 785, and observed that the State's duty to preserve was "limited to constitutionally material evidence," *id.* The court held that to be "constitutionally material," the evidence "must potentially possess exculpatory value and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Id.* (citing *Ferguson*, 2 S.W.3d at 915, 918). "If the trial court determines that the State had a duty to preserve the evidence, the court must determine if the State failed in its duty." *Merriman*, 410 S.W.3d at 785 (citing *Ferguson*, 2 S.W.3d at 917). If the trial court concludes that the State lost or destroyed evidence that it had a duty to preserve, the trial court must then consider three factors to determine the appropriate remedy for the State's failure:

> "(1) [t]he degree of negligence involved;
> (2) [t]he significance of the destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available; and
> (3) [t]he sufficiency of the other evidence used at trial to support the conviction."

*Merriman*, 410 S.W.3d at 785 (quoting *Ferguson*, 2 S.W.3d at 917). "If the trial court concludes that a trial would be fundamentally unfair without the missing evidence, the trial court may then impose an appropriate remedy to protect the defendant's right to a fair trial, including, but not limited to, dismissing the charges or providing a jury instruction." *Merriman*, 410 S.W.3d at 785-86.

We review the trial court's decision concerning the fundamental fairness of a trial conducted without the missing evidence under a de novo standard of review. *Id.* at 791 ("Because the application of *Ferguson* . . . presents a constitutional issue, we will apply a de novo standard of review to the trial court's decision concerning the fundamental fairness of the trial."). The trial court's choice of remedy, however, will not be overturned on appeal absent a showing that the trial court abused its discretion. *Id.* at 792 ("Thus, when the chosen remedy is consistent with the findings made by the trial court utilizing the *Ferguson* considerations, we will not overrule that choice on appeal.").

In the instant case, the defendant has failed to demonstrate what, if any, exculpatory evidence the cellular telephone would have provided. Although the defendant argues that the telephone would have been relevant to determine his location at the time of the murder, hence potentially providing the defendant with an alibi, his argument is misplaced. The mere location of the telephone, or the fact that it was being used for text messaging or other data entry, would in no way prove that the defendant was in possession of the telephone at that time. Moreover, the defendant has failed to show that certain data the telephone might have contained, such as records of incoming and outgoing calls, text messages, and the like, were not available from other sources. Accordingly, the cellular telephone was not "constitutionally material evidence" and, therefore, the State had no duty to preserve it. *Merriman*, 410 S.W.3d at 785.

## *II. Right to Call Witnesses*

The defendant next contends that the trial court erred by denying his request to call Captain McPherson and Investigator Narramore as witnesses at trial, claiming that the trial court's denial deprived him of the right to present a defense.

Although "[p]rinciples of due process require that a defendant in a criminal trial have the right to present a defense and to offer testimony" favorable to his cause, *State v. Flood*, 219 S.W.3d 307, 316 (Tenn. 2007) (citing *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973); *State v. Brown*, 29 S.W.3d 427, 431 (Tenn. 2000)), that right is not without limits*, see id.* (citing *Chambers*, 410 U.S. at 302). Indeed, the Supreme Court has observed that "[i]n the exercise of this right, the accused, as is required of the State, must comply with established rules of procedure and evidence." *Chambers*, 410 U.S. at 302. "So long as the

rules of procedure and evidence are not applied arbitrarily or disproportionately to defeat the purposes they are designed to serve, these rules do not violate a defendant's right to present a defense." *Flood*, 219 S.W.3d at 316 (citing *United States v. Scheffer*, 523 U.S. 303, 308 (1998); *Holmes v. South Carolina*, 547 U.S. 319 (2006); *Chambers*, 410 U.S. at 302). To determine whether a particular evidentiary ruling has violated a defendant's constitutional right to present a defense, a reviewing court must consider:

> (1) Whether the excluded evidence is critical to the defense;
>
> (2) Whether the evidence bears sufficient indicia of reliability; and
>
> (3) Whether the interest supporting exclusion of the evidence is substantially important.

*Flood*, 219 S.W.3d at 316 (citing *Brown*, 29 S.W.3d at 434-35; *State v. Rice*, 184 S.W.3d 646, 673 (2006); *State v. Rogers*, 188 S.W.3d 593, 614 (Tenn. 2006)).

In the instant case, the defendant, in a hearing outside the presence of the jury, indicated his intention to call Captain McPherson and Investigator Narramore as witnesses to address the issue of the failure to collect the cellular telephone at issue. The trial court denied the request, finding the testimony they would give to be irrelevant and "too far afield."

Reviewing the trial court's decision against the criteria set forth in *Flood*, we find that, although the testimony of the two officers would bear "sufficient indicia of reliability" given their status as law enforcement officers, we cannot say that their testimony would have been "critical to the defense." *See Flood*, 219 S.W.3d at 316. The trial court permitted the defendant to conduct a thorough cross-examination of Sergeant Wenger regarding Captain McPherson's order to not collect the cellular telephone and the unusual nature of such an order. To the extent the defendant, as part of his defense, intended to call into question the credibility of Captain McPherson, he was able to do so through Sergeant Wenger.

Moreover, given the tenuous relevance of the cellular telephone, the interest supporting exclusion of the testimony of Captain McPherson and Investigator Narramore was "substantially important." *Id.* Relevant evidence is evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. "Evidence which is not relevant is not admissible," Tenn. R. Evid. 402, and even if evidence

is deemed relevant, it may still be excluded "if the probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. We find no abuse of discretion in the trial court's refusal to allow the testimony of Captain McPherson and Investigator Narramore. Even if their testimony could have been considered relevant under Rule 401, it was properly excluded due to the danger of confusing the issues and would have been considered cumulative in light of Sergeant Wenger's testimony. Accordingly, the exclusion of their testimony was not error.

### III. Prior Inconsistent Statement

The defendant argues that the trial court erred by permitting the State to impeach Mr. Simpson and by allowing the State to introduce Mr. Simpson's prior inconsistent statement into evidence.

### A. Impeachment

At trial, the State called Mr. Simpson as a witness. After asking a few preliminary questions, the prosecutor asked Mr. Simpson if he knew who had killed Mr. Hughes, and Mr. Simpson responded, "No." Mr. Simpson acknowledged giving a prior statement to law enforcement officers and pleading guilty in exchange for his testimony against the defendant. Mr. Simpson also acknowledged his signature on his plea agreement and agreed that he had represented himself with the assistance of elbow counsel, who was present in the courtroom at trial. Mr. Simpson then reiterated that he did not know who had killed Mr. Hughes. At that point, the prosecutor questioned Mr. Simpson about the statement he gave to Sergeant Wenger on July 15, 2010. Mr. Simpson refused to read his statement aloud, and the prosecutor announced his intention to play the recording of the statement, at which point the defense objected on the basis of hearsay. The trial court overruled the objection on the basis that the statement was admissible as a prior inconsistent statement and allowed the prosecutor to play the recording of Mr. Simpson's statement, which provided, in pertinent part:

> A:     That fatal bullet came from [the defendant].
>
> Q:     Did you actually see [the defendant] . . . did you see [the
>          defendant] shoot and watch the guy drop?
>
> A:     I see [the defendant] pull the gun up and *boom*! Once I
>          heard *boom*, you know what I'm saying, that .45 so loud
>          it automatically gives you like . . . uh . . . your instinct is

to jerk down something, you know what I'm saying, I jerked down. First thing in my head I'm like man this n***** startin' to shoot man. Let me get in this car. I . . . I ain't . . . I'm the only n***** out here with no gun. When I looked back that way, man, Dude's on the ground, you know what I'm saying. It wadn't [sic] like I just stopped and looked, you know what I'm saying, like damn he did. It's like I looked like . . . kind ah like out the corner of my eye I seen him on the ground. I kept running to the car. When we . . . when [the defendant] finally got in the car that when he said Dude dead, I killed him. He dead. I said man you bulls*** man, how you gonna kill somebody when we ain't even get nothing. He was like man I killed him, he is dead man. He said I kicked his body looking for my shoe and everything.

Q:      So you saw [the defendant] shoot one (1) time?

A:      Yeah, one (1).

At the hearing on the defendant's motion for new trial, the parties stipulated that, prior to trial, Mr. Simpson had written a letter to the prosecutors, which letter stated as follows:

This is John Simpson. I'm sending this letter in regards to my plea-agreement. I cannot honor our plea-agreement that we have. I've had to[o] many threats to my family as well as acts of violence committed to my family. I would love to testify against [the defendant] and ensure a guilty verdict as well as a life sentence. I know that you cannot keep putting the trial date off. This has nothing to do with my safety, only my family. It has taken more time for my loved-ones to move out of town & they won't be ready for Sept. 3. I also understand that my choice comes with a heavy price which would be a trial date as well as a life sentence. You don't understand how badly I want to testify against [the defendant]. I think about it everyday. I would be very thankful if you could put the trial-date off one more time but if you can't I understand. Please get in touch with my stand-by counsel Mr. Brooks so I will know what you plan

to do. Thank you.

The defendant argued that the State impermissibly called Mr. Simpson as a witness for the sole purpose of impeaching him with his otherwise-inadmissible statement. The prosecutor responded that, based on Mr. Simpson's equivocal statements in his letter, he believed Mr. Simpson would testify at trial in order to maintain his plea agreement and that he also believed Mr. Simpson was simply trying to delay the trial and "work the system." At the conclusion of the hearing, the trial court held that Mr. Simpson was not called to testify solely to introduce his prior statement to Sergeant Wenger.

In this appeal, the defendant relies on *Mays v. State*, 495 S.W.2d 833 (Tenn. Crim. App. 1972), and its progeny for the proposition that a witness may not be called for the sole purpose of introducing a prior inconsistent statement. In *Mays*, the State called two witnesses to testify against the defendants at trial, and when both witnesses refused to implicate the defendants in the crime, the State impeached the witnesses with their prior statements to law enforcement officers in which they implicated the defendants. *Id.* at 836. Because the State knew as early as the preliminary hearing that the witnesses had repudiated their statements and would continue to do so at trial, this court held on appeal that the trial court erred by permitting the impeachment because "it was calculated to and did serve only one purpose which was to put before the jury the out of court statements." *Id.* at 836-37; *see also State v. Steve Johnson*, No. 02-C-01-9504-CC-00097, slip op. at 12-15 (Tenn. Crim. App., Jackson, Feb. 27, 1997) (reversing defendant's conviction upon a finding that the State was on notice that witness intended to repudiate statement against defendant and that the trial court's subsequent curative instruction to jury to disregard witness's testimony was "insufficient to overcome the serious prejudicial effect of putting the out of court statements made by [the witness] in front of the jury"); *State v. Roy L. Payne*, No. 03C01-9202-CR-45, slip op. at 4 (Tenn. Crim. App., Knoxville, Feb. 2, 1993) (reversing defendant's conviction upon a finding that State was on notice that witness would repudiate prior statement against defendant and holding that "such impeachment cannot be a mere ruse to introduce highly prejudicial and improper testimony").

These cases are distinguishable from the facts of the instant case because Mr. Simpson did not actually repudiate his prior statement. In his letter to the prosecutors, he unquestionably equivocated about testifying, stating that he could not honor his plea agreement, but he also expressed twice how much he wished to testify against the defendant. A plain reading of the letter also indicates that, if the State were willing to postpone the trial to allow Mr. Simpson's family time to leave town, he would be willing to testify against the defendant. Therefore, nothing indicates that the State called Mr. Simpson as a witness for the sole purpose of impeachment. Because decisions regarding the admissibility or exclusion of evidence other than hearsay generally are reviewed for an abuse of discretion, *see State*

*v. Banks*, 271 S.W.3d 90, 116 (Tenn. 2008), we find no abuse of discretion in the trial court's decision to allow the State to impeach Mr. Simpson with his prior inconsistent statement.

*B. Substantive Evidence of Prior Inconsistent Statement*

After the State played the recording for the jury of Mr. Simpson's statement to Sergeant Wenger, Mr. Simpson confirmed that was his voice on the recording, and he agreed that, on the recording, he had stated that the defendant had killed Mr. Hughes, but he then stated, "I'm not saying that [the defendant] killed Bernard Hughes, I'm not saying that." Mr. Simpson then stated that he did not wish to testify. At that point, the trial court excused the jury and conducted a hearing outside the jury's presence.

The trial court, following a lengthy hearing outside the presence of the jury, concluded that the redacted audio-recorded statement met the qualifications of Tennessee Rule of Evidence 803(26) for admission of a prior inconsistent statement as substantive evidence and allowed the recording to be admitted into evidence. In this appeal, the defendant argues that the trial court erred in allowing the recording to be admitted as substantive evidence because the statement was not "made under circumstances indicating trustworthiness," as required by Rule 803(26)(C).

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). "Hearsay is not admissible except as provided by these rules or otherwise by law." *Id*. 802. Tennessee Rules of Evidence 803 and 804 provide exceptions to the general rule of inadmissibility of hearsay. Because "[n]o factual issue attends" the trial court's determination whether a statement is hearsay, "it necessarily is a question of law." *State v. Gilley*, 297 S.W.3d 739, 760 (Tenn. Crim. App. 2008) (citing *State v. Schiefelbein*, 230 S.W.3d 88, 128 (Tenn. Crim. App. 2007); *Keisling v. Keisling*, 196 S.W.3d 703, 721 (Tenn. Ct. App. 2005)); *see also Edward Thomas Kendrick, III v. State*, ___ S.W.3d ___, ___ No. E2011-02367-SC-R11-PC, slip op. at 35 (Tenn. Jan. 16, 2015). Although the application of the various exceptions to the hearsay rule "may initially depend upon factual determinations" to which a reviewing court must defer, the trial court "has no discretion to exclude hearsay exception evidence that is otherwise admissible under the rules of evidence." *Id*. at 760-61. Thus, the appropriate standard of review to be applied to the trial court's decision admitting or excluding hearsay evidence is de novo. *Id*.

To be admissible as substantive evidence via Rule 803(26), a statement must first be admissible as a prior inconsistent statement via Rule 613(b). That rule allows impeachment of the witness via his or her prior inconsistent statement but provides that the "[e]xtrinsic evidence of a prior inconsistent statement by a witness is not admissible unless

-13-

and until the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require." Tenn. R. Evid. 613(b). Thus, when a witness testifies in a manner that is inconsistent with a previous statement, the witness's testimony may be impeached with the prior inconsistent statement. *Id.* Once the requirements for admissibility for impeachment purposes under Rule 613(b) have been met, the witness's statement may be admitted as substantive evidence under Rule 803(26) provided:

> (A) The declarant must testify at the trial or hearing and be subject to cross-examination concerning the statement.

> (B) The statement must be an audio or video recorded statement, a written statement signed by the witness, or a statement given under oath.

> (C) The judge must conduct a hearing outside the presence of the jury to determine by a preponderance of the evidence that the prior statement was made under circumstances indicating trustworthiness.

Tenn. R. Evid. 803(26). The Advisory Commission Comments to this subsection, which was adopted in 2009, note that "[m]any other jurisdictions have adopted this approach to address circumstances where witnesses suddenly claim a lack of memory in light of external threats of violence which cannot be directly attributed to a party, for example." *Id.*

In the instant case, Mr. Simpson's statement was unquestionably admissible as a prior inconsistent statement under Rule 613(b). The defendant takes no issue with the first two prongs of Rule 803(26), and we find that those qualifications were certainly satisfied: Mr. Simpson testified at the trial, he was subject to cross-examination regarding the statement, and the statement was an audio-recorded statement. *See* Tenn. R. Evid. 803(26)(A)-(B). The defendant contends only that Mr. Simpson's statement was not made under circumstances indicating trustworthiness. We disagree.

Shortly after his arrest on July 15, 2010 for, among other things, first degree murder, Mr. Simpson gave an extremely incriminating statement to Sergeant Wenger, admitting that he participated in the attempted robbery of Mr. Hughes and that he was present with the defendant when the defendant murdered Mr. Hughes. Mr. Simpson's question to the defendant, included within Mr. Simpson's statement, of "how you gonna kill somebody when we ain't even get nothing" shows that he and the defendant intended to rob Mr. Hughes. Had Mr. Simpson gone to trial, this statement would have been admissible against

-14-

him, supplying a further indicia of reliability. *See* Tenn. R. Evid. 803(1.2) (hearsay exception for a "statement offered against a party that is . . . the party's own statement"). Mr. Simpson made this statement to Sergeant Wenger at the police station after signing a waiver of his rights and agreeing to speak with Sergeant Wenger. We find, as did the trial court, that this statement was "made under circumstances indicating trustworthiness." Tenn. R. Evid. 803(26); *see State v. Devonta Amar Cunningham*, No. M2012-02203-CCA-R3-CD, slip op. at 19 (Tenn. Crim. App., Nashville, Jan. 14, 2015) (upholding trial court's decision to exclude prior inconsistent statement as substantive evidence when, among other things, witness's statement was made at home "as opposed to in a formal setting such as the police department" and therefore was not "necessarily a circumstance that supports trustworthiness"); *State v. Charles Jackson and Willis Holloway*, No. W2010-01133-CCA-R3-CD, slip op. at 13-14 (Tenn. Crim. App, Jackson, Feb. 17, 2012), *perm. app. denied* (Tenn. June 22, 2012) (finding evidence did not preponderate against trial court's finding of trustworthiness when former co-defendant's statement to police included "'very detailed'" information regarding the crimes). As such, the trial court did not err by admitting Mr. Simpson's redacted statement into evidence.

### IV. Cross-Examination of Witness Simpson

Finally, the defendant argues that the trial court erred by limiting his ability to meaningfully cross-examine Mr. Simpson, thereby infringing on his constitutional right to confront witnesses against him. Again, we disagree.

In Tennessee, "the propriety, scope, manner and control of the examination of witnesses is a matter within the discretion of the trial judge, subject to appellate review for abuse of discretion." *State v. Caughron*, 855 S.W.2d 526, 540 (Tenn. 1993); *see State v. Hutchison*, 898 S.W.2d 161, 172 (Tenn. 1994); *State v. Dishman*, 915 S.W.2d 458, 463 (Tenn. Crim. App. 1995); *State v. Barnard*, 899 S.W.2d 617, 624 (Tenn. Crim. App. 1994); *see also* Tenn. R. Evid. 611(a) (stating that the trial court has authority to "exercise appropriate control over the presentation of evidence and conduct of the trial when necessary to avoid abuse by counsel"). Consequently, absent a clear abuse of discretion that results in manifest prejudice to the accused, this court will not interfere with the trial court's exercise of its discretion on matters pertaining to the examination of witnesses. *State v. Johnson*, 670 S.W.2d 634, 636 (Tenn. Crim. App. 1984).

Here, the trial court, upon ruling that Mr. Simpson's redacted statement to Sergeant Wenger would be admissible as substantive evidence, granted defense counsel "wide open cross-examination, on whatever he wants to cross-examine on, and then based upon that cross-examination, there may be other things that the State can go into." Defense counsel then cross-examined Mr. Simpson as follows:

Q: Mr. Simpson, the jury's heard a statement you gave at an earlier date, in which you indicated, I think to [Sergeant] Wenger, that [the defendant] killed Bernard Hughes, is that a true statement, is that true?

A: I plead the Fifth Amendment on that.

Trial Court: Mr. Simpson, now, you earlier testified about that, I'm going to require that you answer the question that [defense counsel is] asking you.

A: Please ask the question again.

Q: Did [the defendant] kill Bernard Hughes?

A: You're asking me if that's true?

Q: I'm asking you that question, did he.

A: No.

Q: No?

A: No.

Q: When you said that earlier, was that true then, in that statement we've all heard?

A: Yeah.

Q: I'm sorry, let me be clear.

A: You asked me if [the defendant] --

Q: Did [the defendant] kill Bernard Hughes?

A: No.

Q: When you said that to [Sergeant] Wenger, did you

-16-

believe he had killed him then?

Q:                So you weren't telling the truth then?

A:                No.

Q:                That's all I have.

The State then conducted a brief redirect examination of Mr. Simpson, which the trial court terminated, telling the prosecutor in a bench conference that he was about to tread "on some dangerous territory." The trial court excused Mr. Simpson and instructed the jury members that the weight they were to give to Mr. Simpson's recorded statement was for them to decide.

Nothing indicates that the trial court improperly restricted the defendant's ability to effectively cross-examine Mr. Simpson. Indeed, the trial court permitted the defendant "wide open cross-examination." On the heels of this ruling, defense counsel then proceeded to ask Mr. Simpson a few, pointed questions centered on whether the defendant had killed Mr. Hughes, which Mr. Simpson repeatedly denied. Clearly, this was an effective examination that in no way prejudiced the defendant. The defendant is not entitled to relief on this issue.

*Conclusion*

Based upon the foregoing analysis, we affirm the judgments of the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE