IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
March 24, 2017 Session

## CLAIRE NICOLA BELL v. TIMOTHY JOHN BELL

**Appeal from the Circuit Court for Hamilton County**
**No. 10D2000      W. Jeffrey Hollingsworth, Judge**

_____

**No. E2016-01180-COA-R3-CV**

_____

This appeal concerns visitation in a post-divorce setting. Claire Nicola Bell ("Mother") and Timothy John Bell ("Father") are parents of the two minor children at issue, ages eleven and seven at trial ("the Children"). Mother and Father divorced in 2012. Both parents were named "co-primary residential parents" and each parent received equal visitation time with the Children. Later, as the arrangement grew contentious, Mother filed a petition for modification seeking to be named exclusive primary residential parent. Father, in turn, filed a counter-petition seeking the same designation. A hearing was conducted before the Circuit Court for Hamilton County ("the Trial Court"). Afterward, the Trial Court named Father primary residential parent and awarded him increased visitation time with the Children. We affirm the judgment of the Trial Court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed;
Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which CHARLES D. SUSANO, JR. and THOMAS R. FRIERSON, II, JJ., joined.

Janie Parks Varnell and Bryan H. Hoss, Chattanooga, Tennessee, for the appellant, Claire Nicola Bell.

Russell Anne Swafford, Dunlap, Tennessee, for the appellee, Timothy John Bell.

# OPINION

## Background

Mother and Father divorced in 2012. The permanent parenting plan designated Mother and Father "co-primary residential parents" of their two minor children. However, the plan further provided: "[I]n the event the Parental Kidnapping Act or similar State or Federal Statu[t]e is invoked, the Father shall be designated as the Primary Residential Parent for these purposes." The parents received equal visitation time at 182.5 days per year each, with alternating weekends and alternating two days per week.

At the time of the divorce, both parents lived in North Chattanooga. Father remarried and, with his new wife, had a daughter. Mother went to reside with a close friend and the Children's pediatrician, Dr. Jane Jones ("Dr. Jones"). Father later bought a home in Signal Mountain, Tennessee. Both children were enrolled at Normal Park Elementary School. Father, previously a schoolteacher, took a job in real estate development. Mother, originally from England, is a rock climbing enthusiast who coaches rock climbing from time to time. Dr. Jones and Mother moved to another home in Chattanooga. Dr. Jones pays the mortgage, and, indeed, pays for most of Mother's expenses. Father's home is zoned for Signal Mountain schools. Due to ongoing problems complying with the parenting plan, the parties attended mediation in September 2014. Later, Father made plans to relocate to the Knoxville area and so notified Mother.

In October 2015, Mother filed her Petition for Modification and Opposition to Parental Relocation in the Trial Court. Mother sought to be designated the exclusive primary residential parent. In December 2015, Father filed a response and counter-petition seeking to be named the primary exclusive residential parent himself. Soon after, Father announced that he would not relocate, after all. More mediation ensued to no avail. The parties submitted amended proposed parenting plans. This matter was tried over the course of two days in April and May 2016. Perhaps the most disputed issue at trial was that of whether Mother neglected the Children's educational needs in favor of their rock climbing. Also at issue was Mother's apparent financial dependency on Dr. Jones. We recount only the pertinent testimony.

Mother testified that she and Dr. Jones have a deep platonic friendship. Mother stated that she felt rock climbing was a key part of the Children's lives. Mother testified at length concerning her views on whether she and the Children were overly consumed with rock climbing as well as whether the Children's schoolwork suffered because of it:

> Q. Ms. Bell, don't you think it's important for the children to have more than one activity?

A. I think it's important for the children to be happy and thriving and loving what they are doing, yes. And more than one activity, sure. Climbing, cross country, fantastic. Climbing, Daisy Scouts. There's nothing wrong with - - [the Children], I definitely don't think something every day after school, the children cannot handle. But yeah, no, I don't have a problem with that.

Q. As long as climbing's included, correct?

A. Climbing, yes, to stop climbing is foolish. The children love climbing. They thrive from it. They are natural climbers. Their body type is perfect. They don't struggle one bit with climbing. All they do is excel, get better and better and better. Happier and happier and happier about it. You know, they win a competition on their second or you know - - they go to the climbing gym and they climb their project that they've been working on for three days. I mean, they're just glowing. Climbing is such a positive part of their lives and it has been a part of all of our family's life for a number of years. Before they were born climbing was there.

Q. And Ms. Bell, climbing is your preference. That was your choice, correct?

A. Tim -- when I met Tim, we were going to be climbing until we were old. That was it. We were going to have children, and we were going to move to England. We were going to go to Australia, we were going to be a climbing family. That's all we ever did when we were married, every single weekend. Climbing was our passion.

Q. But it's fair to say, you're the one that wanted the parenting to focus them on climbing, correct?

A. Not originally. They were born into a climbing family.

Q. Well, let me ask you this: You talked about they can thrive and their body type is perfect, you don't know that those children might thrive at soccer, do you? Or basketball? Or any other sport, do you?

A. Soccer is a little bit iffy for [W.] because he does not like to get muddy. Basketball, I think that what I would like to see happen is that his dad takes him to basketball, one on one, you know, go down to the YMCA. You know, let's do this for a few months, [W.]. Let's see if you really like this. Let's see if you're good at it. Let's have some [W.]/dad time. You know, and then we'll see where basketball goes. But we don't have any idea because he signs him up for basketball out of just - - out of anywhere. [W.]'s not even held a basketball for a year. And [W.]'s confidence is low. And you just don't know if [W.]'s going to thrive with basketball. What [W.] needs is to go with Dad to the Y and see where it goes.

Q. But you wouldn't know because all their time is focused on climbing, correct?

A. Not all of their time, no.
Q. The majority of their time, correct?
A. No. Not enough of their time to be honest with you.
Q. So you would like to see them climb more?
A. They would like to climb more.
Q. You would like to see them climb more.
A. If it makes them happy, which I believe it does.

*** 

Q. Do you think [Father]'s not an appropriate parent?
A. I - - okay. I think on my schedule that the kids and Tim will all thrive. I think that if you keep the schedule the way it is or go to his schedule, you're just hurting everyone and you're - - he is the most controlling person ever. He has anger that I - - I just see that trying to coparent him and I do not see this getting any better. It is getting worse and worse and worse. And there was some - - it is affecting [W.] in a very negative way. It's affecting both children in a very negative way. [W.]'s just older to where he's able to express it a little more in an understandable way.

*** 

Q. So if he isn't finished with his [homework], you let him stop, correct? That's what you testified to.
A. I do. But it's about 15 - - he finishes his work, basically. I mean, I would say 8 percent of his math over the entire history of his life is not done. Most of it is done. It's done.
Q. And I think you said that the math is beyond what you can do, correct?
A. I said that. Yes.
Q. And how far did you go with your formal education, Ms. Bell?
A. I went as far as was required to go. So the end of high school.
Q. What grade would that be in America?
A. So that would be tenth grade. In 1986.
Q. And you admit that you can't do the math, it's beyond you, correct?
A. [W.]'s math.
Q. [W.]'s math. He's 5th grade, correct?
A. Yes.
Q. And you have to depend on Jane to help with math homework?
A. No, I don't have to depend on Jane.
Q. Well, I thought you said Jane steps in? I wrote that down in quotes. Jane steps in.

A. She steps in because we share a house and Jane's an incredibly amazing person and she's there, so why not? Because if it helps me put [R.] to bed - - I've been cooking supper, there's a lot to do to bring up these children and provide them with the great life that we provide them. So yes, Jane steps in. To be honest with you, if I really sat down and looked at the math, I probably could do it. It's probably not that I can't do it. It's that, you know, I have a whole lot, you know, other things to do. And instead of running around like I've got my head cut off like a chicken, Jane steps in and she's there. It's just fantastic and everyone is happy.

Q. So if you took time you could help him with his math?

A. I would suspect that if I sat down and studied his math, I could do it, yes. It's 5th grade.

Q. If it doesn't get finished, you just let him stop, correct?

A. It's not quite like that. It's not like, hey, mom, I don't want to do anymore. Okay, [W.], who cares. It's not like that at all. No. It's usually finished. Lately, I would say in the last six months, there's not really any unfinished whatsoever.

Dr. Jones testified to her friendship with Mother, the centrality of rock climbing to the Children's lives, and her overall role in the family's life:

Q. Do you not see a conflict when you're having a personal relationship with these children and their mother and living with them and being their physician?

A. What could be better? What could be better than having your pediatrician live in your home. We went to Europe. We spent seven weeks in Europe. These children got to travel with their pediatrician. I mean, most people they travel, their kids get hurt, their kids get sick, and they're, like, what do we do, we're in a foreign country, what do we do? Their kids get sick in the middle of the night, they're throwing up, I can call them in meds. They get a rash, I tell them, you know, this is what you do. They get hurt, I say you need to go to the emergency room. I order X-rays. I look at the X-rays myself. I facilitate them going to the emergency room.

\*\*\*

Q. Do you think it's balanced for them to go climbing four to five times a week?

A. Yes, it's what they love. It's who they are. It's what they do. They love their climbing. But it's just a little bit. You know, like on a school day she doesn't take them, you know, she limits the amount of time

because she's got - - they've got to have their play in. They've got to have their snack. They've got to have their play time with their friends. They've got to get their homework done. So she, you know, on a school day, she may just take them for an hour. Whereas on the weekends, she tries to do one-on-one climbing with the kids, and she'll spend like two hours with each kid at the gym. They love the one-on-one time especially with her. And it seems to be - - they get more out of it. They seem to climb more when they're doing that one-on-one.

Father testified to his own concerns about the Children's apparent lack of focus on education, as well as the inordinate amount of time they spend on rock climbing:

I think the kids should have the opportunity to be involved in something that's not athletic based, that might be, you know civic minded like a Girl Scouts or Boy Scouts, which clearly [R.] showed the interest there as I had discussed with Ms. Bell. [W.] had shown a similar interest for the Boy Scouts. A lot of these activities for these kids at this age, they're not year round, they're not four days a week like right now what they do with rock climbing. It's - - cross country is Mondays and Wednesdays during the month of September and they have their meets on Thursdays. And if it rains, it's rained out. There is no makeup day. It's one month out of their entire year that they get to go try something new. So extracurricular activities, hugely important that they get exposed to a variety of them. If it's a school sponsored event, I honestly think that needs to take priority over something that has no affiliation with the kids that they go to school with and the education process.
Q. Is this your - - is it your intent to completely cut them out of rock climbing?
A. Absolutely not. I'm pretty sure that in the extracurricular activities part that we even explained that each parent would be able to choose an activity that they day [sic] do. And if Claire chose that she wanted to be able to have these kids rock climb certain days of the week, as long as it's within reason and doesn't interfere with these kids' ability to participate on regularly scheduled school-sponsored events specifically, I have no problem having set days of the week where rock climbing is their extracurricular activity. She can go pick them up from school, take them climbing, they can climb their brains out, and bring them back in time so we can put the focus on school work and getting their assignments done before school the next day.

***

-6-

Q. And tell the Court what your proposal is and why.

A. I'll go through them, I guess, one at a time. The educational decisions, it's been beyond abundantly clear to me that education is not a priority in any way, shape or form when they're not with me. Whether that's that the children are held out of learning expeditions, which are field trips at their school, whether they are not required to go to their after school performances such as Exhibit Night, simply because they say they don't want to go. Whether it's having - - if the teacher says the child needs to get their work done, we want them to have study hall and not go to recess, whether it's not completing their math homework but simply sitting at the kitchen table for 20 minutes making a good-faith effort. When it comes to the educational decisions, if we didn't spend the amount of time that we do at home to make up for the lack of work getting completed when they're not with me, such a huge percentage of the work would not be getting done. So with educational decisions, I mean, I was a schoolteacher and I went to college. I have a master's degree, so does my wife. My whole family is educated. Education is beyond important to me. And I've not been given any reason to believe that it's important when they're not at my house.

The non-emergency healthcare. Again, father for a couple of reasons. Currently it's supposed to be a joint decision making process there, yet I don't find out that the children have even gone to the doctor until after it has happened so there's no joint decision making currently there at all. I'm not involved in the planning process of those appointments, nor do I know they're happening to be in the office to hear what the doctor's saying about them.

Several other witnesses testified to the strong bond between the Children and Mother. The love each parent has for the Children, and vice versa, is not in dispute.

In August 2016, the Trial Court entered its final order, incorporating its detailed memorandum opinion and parenting plan. The parenting plan designated Father as primary residential parent and awarded him 215 days of visitation to Mother's 150. The Trial Court stated the following, as pertinent, in its memorandum opinion:

The parties agree there has been a material change in circumstances. The Court finds, based on the proof at trial, that they are correct. First, it is clear from the testimony that the current parenting plan is not working to the best interest of the children. The parents are constantly arguing over parenting time, activities of the children and the other party's failure to

communicate with or consult the other parent in regard to decisions on educational, medical or extracurricular activities. The Mother seems obsessed with rock climbing. By her own testimony, the children's usual routine after school is to participate in up to two hours of rock climbing before beginning their assigned homework. The Mother admitted that if the homework does not get complete, she does not force the issue. She does not seem to be overly concerned with the children's education. Also, the Mother refuses to allow the children to participate in activities other than rock climbing during her parenting time. She admitted, and it was confirmed by other witnesses, that in 2014, the son was on the school cross country team. On the Mother's parenting days, she would refuse to take the son to cross country practice or to meets. Instead, she would take him rock climbing.

Another change is that the Mother and the children are living with Dr. Jane Jones in a house owned by Dr. Jones in North Chattanooga. That is how the children are able to attend Normal Park. Dr. Jones testified about her close relationship with the children and the Mother and how she has no intention of "putting them out on the street." However, Dr. Jones has no legal obligation to continue to support the Mother and the children and should the relationship sour or something happen to Dr. Jones, the Mother and the children would be without a home.

It is also noted that the Father will oftentimes cut off communication with the Mother when he gets frustrated or does no[t] get an answer to his questions in what he considers an acceptable time.

Having found that material changes have occurred, the Court must assess whether a modification is in the best interest of the children. It is clear that both parents love their children. There is no evidence of abuse or neglect of the children while in the care of either parent. The Father has a good job with the apparent ability to increase his income in the future. The Mother occasionally coaches rock climbing. She testified that she is one of the best coaches around and admitted she is able to work. However, she does not do so. Although the Mother and the children are well provided for in Dr. Jones' home, the Court has already expressed its concerns if the status should change or something happen to Dr. Jones.

In addition, the son will move on to middle school after this year. Whether at Normal Park, where he will go if he stays with the Mother and Dr. Jones, or Signal Mountain, which he will attend if he is with the Father, the son will be faced with greater academic demands. The Mother has demonstrated a lack of concern with the children's education. As stated previously, she has freely admitted that rock climbing came before school work. The Father, on the other hand, emphasizes school work before other

activities and is more willing to tend to the children's educational needs. The daughter is just finishing the first grade but, before long, she will also be facing increased academic demands.

Based upon the findings above, the Court finds that it is in the best interest of the children that the Father be the Primary Residential Parent. The Court also finds that it is in the best interest of the children that they be at one home during the school week. It is essential that the children have frequent and consistent time with both parents. The parenting plan proposed by the Father at trial provides that the children stay with him throughout the school week, but that the Mother have three consecutive weekends before he has a weekend with the children. The Court will adopt that plan with the following modification:

The Mother will have the children on her weekends from after school on Friday until Monday morning when she will take them to school. It is critical for the success of this plan that the Mother have the children at school on time on Monday mornings. In addition, both parents are responsible to have the children at schedule extracurricular or school activities during their parenting time.

During the summer vacation from school, the Mother will have the children during the week, with the Father having every other weekend visitation from Friday at 5:00 P.M. until Monday morning at 9:00 A.M. In addition, during the summer, each parent will have a non-interrupted two week vacation period with the children. The parties will exercise "standard" holiday visitation.

In regard to child support, the counsel for the parties are Ordered to determine the number of days each parent will have under the mandated parenting plan. The Father will continue to supply medical insurance for the children and the cost of that will be credited to him in child support calculations. The Father's income is $5,861.00 per month. That was determined by taking the Father's 2015 income and his year to date 2016 income and averaging those figures. In regard to the Mother's income, she and Dr. Jones testified that the Mother makes "about $1,400.00" per month. However, due to the kindness of Dr. Jones, the Mother does not live a $1,400.00 per month life. The Mother readily admitted she could work and is confident that, with her skills as a climbing coach, could make additional money. Therefore, the Court is going to impute to the Mother, for purposes of child support calculations, an income of $2,100.00 per month, which is a fifty percent (50%) increase over the income she claims at this point.

There has been great dispute about the decisions made by each parent and failure to communicate in regard to those decisions. Both parents are guilty. All decisions will, at this time, remain joint. The Court

is Ordering the parents to enroll and participate in a reconstructive coparenting seminar conducted by MaryAnn Zaha and her organization. The parties are Ordered to contact Ms. Zaha at . . . to enroll. They need to take a copy of the parenting plan with them for their initial meeting with Ms. Zaha. The parties, through their counsel, need to provide to the Court proof that they have enrolled and are fully participating in this program. It is the sincere hope of the Court that through participation in this program, the parties will learn to communicate and cooperate better, which will be of immense benefit to the children.

The new Parenting Plan will not take effect until the current school year is completed.

Mother timely appealed to this Court.

## Discussion

We restate and consolidate Mother's issues on appeal as follows: 1) whether the Trial Court failed to make sufficient factual findings both with respect to a material change in circumstance and the statutory factors applicable to the best interest determination; and, 2) whether the Trial Court erred in finding it is in the Children's best interest to increase Father's visitation time with the Children.

Our review is *de novo* upon the record, accompanied by a presumption of correctness of the findings of fact of the trial court, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). A trial court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *S. Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001).

As an initial matter, the parties were designated "co-primary residential parents" in the first parenting plan. The parenting plan, however, also provided: "[I]n the event the Parental Kidnapping Act or similar State or Federal Statu[t]e is invoked, the Father shall be designated as the Primary Residential Parent for these purposes." This presents a problem, as there should be only one primary residential parent, even if the parents have equal visitation time. We have stated:

Tennessee Code Annotated section 36-6-402(4) defines the primary residential parent as "the parent with whom the child resides more than fifty percent (50%) of the time." If the children were dividing their time equally between the parents, neither parent meets the statutory definition of a primary residential parent. However, Tennessee Code Annotated section

-10-

36-6-410 declares that the designation of a primary custodian is necessary for all state and federal statutes and applicable policies of insurance which require a determination of custody. Thus, "... even though there may be no primary residential parent in fact, the law requires the designation of one parent as the primary residential parent, regardless of the statutory definition." *Cummings v. Cummings*, M2003-00086-COA-R3-CV, 2004 WL 2346000 (Tenn. Ct. App. Oct. 15, 2004). *See also Hopkins v. Hopkins*, 152 S.W.3d 447, 450 (Tenn. 2004).

*Brown v. Brown*, No. E2011-00421-COA-R3-CV, 2012 WL 1267872, at *7 (Tenn. Ct. App. Apr. 13, 2012), *rule 11 appl. perm. appeal denied Aug. 15, 2012*.

In this case, it appears as though both parties sought to modify the parenting plan to become exclusive primary residential parent, even though there should have been only one primary residential parent named in the first place. This is relevant to our standard of review applied to subsequent modifications. Although the Trial Court and parties went along with the questionable notion of "co-primary residential parents," Father was in fact the primary residential parent because of the language designating him as such for the purposes of the Parental Kidnapping Statute and other federal statutes. Therefore, we will proceed with our analysis under the view that, rather than changing custody, the Trial Court simply increased Father's and decreased Mother's visitation time.

This Court has discussed the standard for modification of visitation time as follows:

[W]hen a court is considering a petition to modify a residential parenting schedule, it must first determine whether a material change of circumstance has occurred. Tenn. Code Ann. § 36-6-101(a)(1)(C). If such a change is established, the court proceeds to determine whether modification of the schedule is in the best interest of the child, utilizing the factors at § 36-6-106(a) and, where applicable, § 36-6-406.

*Wheeler v. Wheeler*, No. M2015-00377-COA-R3-CV, 2016 WL 3095695, at *3 (Tenn. Ct. App. May 24, 2016), *no appl. perm. appeal filed*. The standard for reviewing a trial court's modification to a residential parenting schedule is that of abuse of discretion. *Armbrister v. Armbrister*, 414 S.W.3d 685, 693 (Tenn. 2013). An abuse of discretion occurs when a trial court "appl[ies] an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice." *Id*. (quoting *Gonsewski v. Gonsewski*, 350 S.W.3d 99, 105 (Tenn. 2011)).

We have elaborated upon material change of circumstances as follows:

> When the issue before the court is a modification of the residential parenting schedule, the threshold for establishing a material change in circumstance is much lower. *See Boyer v. Heimermann*, 238 S.W.3d 249, 259 (Tenn. Ct. App. 2007); *see also* Tenn. Code Ann. §§ 36-6-101(a)(2)(B), -101(a)(2)(C). The petitioner still must prove by a preponderance of the evidence a material change of circumstance affecting the child's best interest, and the change must have occurred after entry of the order sought to be modified. *Caldwell v. Hill*, 250 S.W.3d 865, 870 (Tenn. Ct. App. 2007). However, unlike the standard for a change of primary residential parent, whether the change was reasonably anticipated when the prior residential parenting schedule order was entered is irrelevant. *Armbrister*, 414 S.W.3d at 703. To modify a residential parenting schedule, "merely showing that the existing arrangement [is] unworkable for the parties is sufficient." *Rose v. Lashlee*, No. M2005-00361-COA-R3-CV, 2006 WL 2390980, at *2 n. 3 (Tenn. Ct. App. Aug. 18, 2006).

*Gentile v. Gentile*, No. M2014-01356-COA-R3-CV, 2015 WL 8482047, at *5 (Tenn. Ct. App. Dec. 9, 2015), *no appl. perm. appeal filed*.

Tenn. Code Ann. § 36-6-106(a)(Supp. 2016) sets forth the following factors related to the best interest of the child that are to be considered in parenting time modification cases:

> (a) In a suit for annulment, divorce, separate maintenance, or in any other proceeding requiring the court to make a custody determination regarding a minor child, the determination shall be made on the basis of the best interest of the child. In taking into account the child's best interest, the court shall order a custody arrangement that permits both parents to enjoy the maximum participation possible in the life of the child consistent with the factors set out in this subsection (a), the location of the residences of the parents, the child's need for stability and all other relevant factors. The court shall consider all relevant factors, including the following, where applicable:
>
> (1) The strength, nature, and stability of the child's relationship with each parent, including whether one (1) parent has performed the majority of parenting responsibilities relating to the daily needs of the child;

(2) Each parent's or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child. In determining the willingness of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, the court shall consider the likelihood of each parent and caregiver to honor and facilitate court ordered parenting arrangements and rights, and the court shall further consider any history of either parent or any caregiver denying parenting time to either parent in violation of a court order;

(3) Refusal to attend a court ordered parent education seminar may be considered by the court as a lack of good faith effort in these proceedings;

(4) The disposition of each parent to provide the child with food, clothing, medical care, education and other necessary care;

(5) The degree to which a parent has been the primary caregiver, defined as the parent who has taken the greater responsibility for performing parental responsibilities;

(6) The love, affection, and emotional ties existing between each parent and the child;

(7) The emotional needs and developmental level of the child;

(8) The moral, physical, mental and emotional fitness of each parent as it relates to their ability to parent the child. The court may order an examination of a party under Rule 35 of the Tennessee Rules of Civil Procedure and, if necessary for the conduct of the proceedings, order the disclosure of confidential mental health information of a party under § 33-3-105(3). The court order required by § 33-3-105(3) must contain a qualified protective order that limits the dissemination of confidential protected mental health information to the purpose of the litigation pending before the court and provides for the return or destruction of the confidential protected mental health information at the conclusion of the proceedings;

(9) The child's interaction and interrelationships with siblings, other relatives and step-relatives, and mentors, as well as the child's involvement with the child's physical surroundings, school, or other significant activities;

(10) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment;

(11) Evidence of physical or emotional abuse to the child, to the other parent or to any other person. The court shall, where appropriate, refer any issues of abuse to juvenile court for further proceedings;

(12) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child;

(13) The reasonable preference of the child if twelve (12) years of age or older. The court may hear the preference of a younger child upon request. The preference of older children should normally be given greater weight than those of younger children;

(14) Each parent's employment schedule, and the court may make accommodations consistent with those schedules; and

(15) Any other factors deemed relevant by the court.

Before proceeding to the merits, we first address whether the Trial Court failed to make sufficient factual findings both with respect to a material change in circumstance and as to the statutory factors applicable to the best interest determination. Mother points out that the Trial Court did not identify the statutory factors correlative to its findings. However, this is not a fatal error. This Court has stated that "the absence of an explicit discussion of each factor does not mean that they were not considered." *Keisling v. Keisling*, 196 S.W.3d 703, 723 (Tenn. Ct. App. 2005). The Trial Court made detailed findings, as quoted already, as to the Children's best interest. These findings included, among others, that both parents love the Children, Mother's demonstrated lack of concern with the Children's education, and that Father will better tend to the Children's educational needs. We find these findings sufficient.

Mother argues further that the Trial Court failed to articulate how the material change of circumstances cited affects the Children's well-being. As relevant both to whether there was a material change of circumstances and to the best interest of the

-14-

Children, the Trial Court found "that the current parenting plan is not working to the best interest of the [C]hildren." The Trial Court continued, stating: "The parents are constantly arguing over parenting time, activities of the children and the other party's failure to communicate with or consult the other parent in regard to decisions on educational, medical or extracurricular activities." The Trial Court stated: "Mother refuses to allow the children to participate in activities other than rock climbing during her parenting time." The Trial Court made findings regarding the Children's current living arrangement: "Dr. Jones has no legal obligation to continue to support the Mother and the children and should the relationship sour or something happen to Dr. Jones, the Mother and the children would be without a home."

It should be noted that although both parties asserted a material change in circumstance below, Mother argues on appeal that she means circumstances other than those the Trial Court found. Such a distinction is immaterial here as we find that the evidence does not preponderate against any of the Trial Court's factual findings. We find further that the Trial Court correctly found a material change in circumstances, a change certainly sufficient to justify modification of the residential schedule which we find to be the actual issue. We note that this material change as found here also would be sufficient to modify custody if custody rather than the residential schedule were at issue.

Having affirmed the Trial Court in its finding a material change in circumstances, we next address whether the Trial Court erred in finding that is in the Children's best interest to increase Father's and, necessarily, decrease Mother's visitation time with the Children. While the Trial Court did not specifically identify the statutory factors it deemed applicable, it clearly did make findings as to some of them. We discern factor (4) concerning "[]the disposition of each parent to provide the child with food, clothing, medical care, education and other necessary care" to be the most relevant, and clearly so did the Trial Court. To revisit, the Trial Court found that:

> It is clear that both parents love their children. There is no evidence of abuse or neglect of the children while in the care of either parent. The Father has a good job with the apparent ability to increase his income in the future. The Mother occasionally coaches rock climbing. She testified that she is one of the best coaches around and admitted she is able to work. However, she does not do so. Although the Mother and the children are well provided for in Dr. Jones' home, the Court has already expressed its concerns if the status should change or something happen to Dr. Jones.
> In addition, the son will move on to middle school after this year. Whether at Normal Park, where he will go if he stays with the Mother and Dr. Jones, or Signal Mountain, which he will attend if he is with the Father, the son will be faced with greater academic demands. The Mother has

demonstrated a lack of concern with the children's education. As stated previously, she has freely admitted that rock climbing came before school work. The Father, on the other hand, emphasizes school work before other activities and is more willing to tend to the children's educational needs. The daughter is just finishing the first grade but, before long, she will also be facing increased academic demands.

The evidence does not preponderate against the findings made by the Trial Court relative to the issue of best interest. The Trial Court saw and heard the live witness testimony and rendered a well-reasoned judgment modifying the parenting plan. The Trial Court credited Father's testimony regarding Mother's and the Children's excessive emphasis on rock climbing while under Mother's care to the exclusion of other activities, including their education. Mother's own testimony serves to reinforce this conclusion. The Trial Court also was concerned with Mother's financial dependence upon Dr. Jones and contrasted that arrangement with Father's independence and relative stability. We decline to tweak or second-guess the Trial Court's discretionary decision. We affirm the Trial Court in its modification of the parenting plan to afford Father more and, necessarily, Mother less visitation time with the Children, as well as to clarify Father's status as primary residential parent.

As a final matter, only in his brief's Conclusion and not in his Statement of Issues as required does Father request his attorney's fees and costs incurred on appeal. We decline to award any attorney's fees. The judgment of the Trial Court is affirmed.

## Conclusion

The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed against the Appellant, Claire Nicola Bell, and her surety, if any.

_____
D. MICHAEL SWINEY, CHIEF JUDGE